**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

THE SEMINOLE TRIBE OF FLORIDA,

*Plaintiff*,

v.

DRAFTKINGS, INC., JASON ROBINS, and GUS III LLC d/b/a DRAFTKINGS PREDICTIONS,

*Defendants*.

Case No.: ____________________

(Removed from the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, Case No. CACE-26-016435)

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1331, 1362, 1441(a), 1442(a), and 1446, Defendants DraftKings Inc. ("DraftKings"), GUS III LLC (d/b/a DraftKings Predictions) ("GUS III"), and Jason Robins, by and through their attorneys, hereby remove the above-captioned action from the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, to the United States District Court for the Southern District of Florida. All named Defendants consent to this removal.

This Notice of Removal is not intended to constitute and should not be construed as constituting a general appearance or appearance on the merits of Defendants in this matter. By filing this Notice of Removal, Defendants do not waive any defenses they have to this action, whether in state or federal court, including, but not limited to, lack of personal jurisdiction. Defendants reserve the right to amend or supplement this Notice of Removal.

In support of removal, Defendants state as follows:

## INTRODUCTION

1. This retaliatory lawsuit is the latest in a series of efforts by the Seminole Tribe to expand its gaming monopoly. Dissatisfied with the billions it already brings in from its tribal casinos, Plaintiff asserts an exclusive monopoly over sports gambling throughout the State of

Florida. To fend off voter-initiative challenges to this monopoly, Plaintiff had signature collectors paid off, harassed, and threatened. And, upon learning that Defendant DraftKings had exercised its constitutional right to challenge aspects of the monopoly in "state court" for violating Florida's constitution, Plaintiff brought this lawsuit to punish DraftKings and its CEO for what the Complaint calls a "direct affront to the Tribe." Compl. (Ex. 1) ¶ 3. But Plaintiff's reach exceeds its grasp: According to Plaintiff, the Seminole Tribe of Florida's monopoly extends not only to gaming but also to fantasy sports and to the trading of derivatives on a nationwide exchange under the "exclusive jurisdiction" of the U.S. Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a).

2. In April 2021, Plaintiff and the State of Florida entered into a gaming compact (the "Compact") under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.* *See* Compl. ¶¶ 2, 26. The Compact grants Plaintiff the right to operate "Covered Games"—including sports betting—"on an exclusive basis throughout the State," without "State-authorized competition," subject to enumerated exception. Compact, Part XII. The next month, the State of Florida implemented the Compact and the Seminole Tribe's monopoly of sports betting throughout the State. *See* Fla. Stat. § 285.710(13)(a)(7). Importantly, this was done without the voter referendum required by the Florida Constitution, which guarantees that "Florida voters shall have the exclusive right to decide whether to authorize casino gambling in the State of Florida" and requires "a vote by citizens' initiative" before such gambling may be "authorized under Florida law." Fla. Const. Art. X, § 30(a).

3. Lawsuits soon followed. The U.S. Court of Appeals for the D.C. Circuit held that the Compact supplied the Tribe no "independent legal authority for gaming activity that occurs outside of Indian lands," *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1068 (D.C. Cir.

2023)—a holding Plaintiff bizarrely claims as a "success[]," Compl. ¶ 58; *see id.* ¶ 3. Challengers also took to state court, seeking a declaration that the Compact's implementing legislation was invalid unless and until Florida voters exercised their constitutional right to approve it.

4. Outside the courtroom, the Tribe turned to intimidation. The first targets were those involved in collecting signatures for ballot initiatives that opposed Plaintiff's monopoly. At first, "entities linked to the Seminole Tribe . . . pa[id] people to stop gathering signatures." Dara Kam, *Legal fight over petition signatures for gambling amendment ends for now*, Miami Herald (Dec. 13, 2021).[1] But when money didn't work, "people associated with [Plaintiff] grabbed clipboards away from signature gatherers, followed workers to their hotel rooms and screamed at voters to keep them from signing petitions." *Id.* The Complaint touts this, too, as a success. *See* Compl. ¶¶ 3, 45.

5. Defendants were the next target. In some States, DraftKings operates a licensed sportsbook. Compl. ¶ 78. But not in Florida. *Id.* In Florida, DraftKings offers only a "fantasy sports" service, *id.* ¶ 74, that has long been permitted in the State, *see* Fla. Op. Att'y Gen. No. 90-58 (July 27, 1990). And, through its federally licensed operations, DraftKings permits customers to trade a type of CFTC-regulated derivative known as an "event contract[]." Compl. ¶ 142. Unlike "sportsbooks and casino games" "offered pursuant to State or Tribal law," the CFTC has explained, these "event contracts"—"including those based on sports-related events"—fall squarely within the agency's "exclusive jurisdiction." *Further Definition of "Swap" To Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65969, 65970–71, 65973 & n.43 (Oct. 19, 2026).

6. To Plaintiff, none of the legal niceties matter. What *does* matter to Plaintiff is that, "[o]n September 17, 2026," "DraftKings . . . formally join[ed]" one of the state-court legal

[1] https://www.miamiherald.com/news/politics-government/state-politics/article256548896.html.

challenges "as a plaintiff." Compl. ¶ 57. According to Plaintiff, this "campaign . . . to undermine the Tribe's rights under the Compact"—what the less vindictive would call a lawsuit—is "a direct affront to the Tribe." *Id.* ¶ 3. Plaintiff filed this Complaint in this case three weeks later, attempting to exert whatever pressure it can to maintain its illegal monopoly.

7. Plaintiff's Complaint is meritless and brought to retaliate against Defendants because they exercised their constitutionally protected rights. Plaintiff spills pages of ink furiously describing constitutionally protected activity—like supporting ballot initiatives and seeking judicial recourse—as if it were impermissible. *See*, *e.g.*, Compl. ¶¶ 3, 42–58. Plaintiff has sued DraftKings and no other participants in markets for event contracts or fantasy sports, even though at least a dozen other companies offer event contracts and fantasy sports in Florida—and have for years.[2] And in doing so, Plaintiff has adopted an underhanded and improper litigation strategy: naming a CEO as a defendant on the theory that running a lawful business is the same as "mastermind[ing]" an illegal "conspiracy." *Id.* ¶¶ 1, 178. That theory has no merit. A federal court recently dismissed a similar RICO claim against Mr. Robins, holding that allegations "essentially directed at actions done via DraftKings itself" do not satisfy RICO's requirement that the defendant be distinct from the enterprise. *See Zhen v. DraftKings, Inc.*, 2026 WL 2186199, at *11 (N.D. Cal. July 29, 2026). More fundamentally, Plaintiff—a Tribe with no constitutional authority outside its tribal lands—is trying to usurp the exclusive authority of the federal government over nationwide derivatives trading.

[2] *See, e.g.* Valerie Cross, *Florida Prediction Markets and Sites for August 2026*, DeFi Rate, https://defirate.com/prediction-markets/florida/ (last visited Nov. 6, 2026); *Florida Daily Fantasy Sports 2026: Legal DFS Sites & Apps*, BettingUSA, https://www.bettingusa.com/states/fl/daily-fantasy/ (last visited Nov. 6, 2026); Sam McQuillan, *PrizePicks, Underdog Switch To Peer-To-Peer Pick'em In Florida*, Legal Sports Report (Apr. 22, 2024), https://www.legalsportsreport.com/178940/underdog-prizepicks-switch-to-peer-to-peer-pickem-in-florida/.

8. Defendants are not so easily intimidated. The state-court lawsuit challenging Florida's failure to hold the constitutionally required voter referendum vote will continue in state court. And because this lawsuit implicates decidedly federal interests, Defendants have removed this case to federal court.

**BACKGROUND**

9. Event contracts are a type of "swap," a financial contract where two parties agree to exchange—swap—payments with each other based on a pre-agreed formula, such as the price of crude oil or interest rates. For event contracts, the payoff "may be based on eventualities and measures as varied as the world's population in the year 2050, the results of political elections, or the outcome of particular entertainment events." *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669, 25669 (May 7, 2008).

10. Designated contract markets, national exchanges where these contracts are traded, are an important component of modern, federally regulated financial markets. Countless Americans rely on these markets to obtain accurate information about consequential events in politics, finance, technology, news, and sports. And through the Commodity Exchange Act ("CEA"), Congress placed these markets squarely within a comprehensive federal regulatory regime and vested exclusive supervisory authority in the CFTC. Defendant DraftKings operates one such market through its wholly owned subsidiary, Railbird Exchange, LLC. *See* Compl. ¶¶ 96, 140.[3]

[3] Defendants describe the relationship between DraftKings and Railbird Exchange, LLC, as the Complaint does, solely for purposes of this Notice. *See* Compl. ¶¶ 96, 140. Defendants do not concede the accuracy of the Complaint's allegations or characterizations, and expressly reserve all rights, arguments, and defenses, including that Railbird Exchange, LLC, is a legal entity separate and distinct from DraftKings.

11. Customers access that market through Defendant GUS III, a CFTC-registered futures commission merchant ("FCM"). *See* 7 U.S.C. § 1a(28). An FCM generally "solicit[s]" or "accept[s] orders for" event contracts and "accepts . . . money . . . to margin, guarantee, or secure any trades" in event contracts. *Id.* FCMs thus "provide customers with access to futures and cleared swaps by acting as intermediaries, facilitating transactions between FCM customers on one side and contract markets and clearing organizations on the other. FCMs also provide customers with important disclosures regarding the risks associated with transacting in futures and cleared swaps." *CFTC Market Participants Division Responds to Frequently Asked Questions Regarding Futures Commission Merchant Registration and Ongoing Regulatory Obligations*, Press Release No. 9091-25 (June 30, 2025).[4]

12. Federal law grants the CFTC "exclusive jurisdiction with respect to" swaps "traded or executed on a contract market designated" under the CEA. 7 U.S.C. § 2(a)(1)(A); *see id.* § 1a(47)(A). Congress implemented that oversight through "a system of effective self-regulation of trading facilities . . . under the oversight of the Commission." *Id.* § 5(b).

13. Accordingly, the CFTC classifies designated contract markets as "[s]elf-regulatory organization[s]." 17 C.F.R. § 1.3. And "self-regulatory organizations such as contract markets" exercise "a form of delegated [government] discretion" to adopt, implement, and enforce regulatory protections—authority that, without contract markets, the CFTC would otherwise exercise itself. *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th 619, 625 (7th Cir. 2022).

14. As part of its "front-line role" in regulation and enforcement, *Turbeville v. Fin. Indus. Regul. Auth.*, 874 F.3d 1268, 1275 (11th Cir. 2017) (describing self-regulatory organizations), a designated contract market is delegated the tasks of "establish[ing], monitor[ing],

[4] https://www.cftc.gov/PressRoom/PressReleases/9091-25.

and enforc[ing] compliance with the rules of the contract market," 7 U.S.C. § 7(d)(2)(A). It must also prevent "manipulation, price distortion, and disruptions" through market surveillance and enforcement. *Id*. § 7(d)(4). All this is work that the CFTC would otherwise have to perform itself.

15. Because designated contract markets exercise such delegated federal authority, federal law carefully controls which entities may become a contract market. An exchange obtains that status only by demonstrating to the CFTC that it complies with each of the CEA's 23 core principles and the CFTC's implementing regulations. *See* 7 U.S.C. §§ 7(a), 7(d), 8(a); 17 C.F.R. § 38.3(a)(2). Those requirements are exacting. An applicant must show, for example, that it prohibits abusive and manipulative trading practices, 17 C.F.R. § 38.152; maintains automated trade-surveillance and real-time market-monitoring systems, *id.* §§ 38.156–.157; and has adequate financial, operational, and managerial resources to discharge its responsibilities, 7 U.S.C. § 7(d)(21). And those responsibilities are ongoing: If a designated contract market fails to satisfy them, the CFTC may suspend or revoke a designation, *id.* §§ 7b, 8(b), or seek injunctive and other relief in federal court, *id.* § 13a-1.

16. Designation also carries a privilege that federal law reserves to registered entities: the authority to list new contracts by certifying to the CFTC that they comply with federal law. 7 U.S.C. §§ 1a(40), 7a-2(c)(1). That privilege, too, is closely supervised. A certification must include an explanation and analysis of the contract's compliance with the CEA and CFTC regulations, including the core principles. 17 C.F.R. § 40.2(a). The CFTC may investigate, stay, or amend a contract after it is listed, *id.* § 40.2(c), and may prohibit event contracts involving "gaming" or other enumerated subjects that it determines are "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C). In short, the authority to list event contracts on a federal exchange belongs only to entities the CFTC has vetted and continues to oversee.

17. The CFTC designated Railbird Exchange as a contract market in June 2025, and DraftKings acquired Railbird Exchange in October 2025.[5] Since trading began in June 2026, Railbird Exchange has operated as a self-regulatory organization under the CFTC's oversight, adopting and enforcing the rules that govern trading on its exchange, and policing that trading for manipulation and abuse. It also lists event contracts by certifying them to the CFTC. The CFTC has not stayed or amended any of those contracts.

18. Federal law also imposes strict requirements on FCMs like GUS III. At the heart of these requirements is an FCM's obligation to facilitate stable trading on prediction markets. *See* Compliance Rule 2-9, *Supervision*, Nat'l Futures Ass'n (Mar. 18, 2026).[6]

19. For instance, FCMs must: "(1) Establish risk-based limits in the proprietary account and in each customer account based on position size, order size, margin requirements, or similar factors"; "(2) Screen orders for compliance with the risk-based limits"; "(3) Monitor for adherence to the risk-based limits intra-day and overnight"; "(4) Conduct stress tests under extreme but plausible conditions of all positions in the proprietary account and in each customer account that could pose material risk to the futures commission merchant at least once per week"; "(5) Evaluate its ability to meet initial margin requirements at least once per week"; "(6) Evaluate its ability to meet variation margin requirements in cash at least once per week"; "(7) Evaluate its ability to liquidate, in an orderly manner, the positions in the proprietary and customer accounts and estimate the cost of the liquidation at least once per quarter"; and "(8) Test all lines of credit

---

[5] Commodity Futures Trading Comm'n, Designated Contract Markets (DCM): Railbird Exchange, LLC, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations/50090 (last visited Nov. 8, 2026); *see* DraftKings, Inc., Annual Report (Form 10-K) at 7 (Feb. 13, 2026), https://www.sec.gov/Archives/edgar/data/1883685/000188368526000013/dkng-20251231.htm.

[6] https://www.nfa.futures.org/rulebooksql/rules.aspx?RuleID=RULE+2-9&Section=4.

at least once per year." 17 C.F.R. § 1.73(a); *see also Annual FCM Requirements*, Nat'l Futures Ass'n.[7]

20. Plaintiff Seminole Tribe of Florida sued DraftKings, GUS III, and DraftKings's Chief Executive Officer, Jason Robins, on October 8, 2026, in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida. Plaintiff contends that some of DraftKings's offerings—including the trading of CFTC-regulated event contracts—"constitute bookmaking in violation of Florida law." Compl. ¶ 94.

21. This Court has jurisdiction under 28 U.S.C. § 1442, the federal officer removal statute. Plaintiff's suit targets functions that DraftKings's designated contract market performs as a self-regulatory organization under the CFTC's oversight, including the regulation of market access as well as the listing and certifying of event contracts. According to the Complaint, DraftKings carries out those functions through Railbird Exchange. Compl. ¶¶ 96, 140. DraftKings is therefore entitled to a federal forum for its federal defenses, including that the CEA preempts Plaintiff's claims.

22. For two independent reasons, this Court also has jurisdiction under 28 U.S.C. § 1331, as well as under 28 U.S.C. § 1362.[8]

23. *First*, each of Plaintiff's claims depends on its contention that the event contracts traded on DraftKings's CFTC-regulated contract market are unlawful gambling rather than

[7] https://www.nfa.futures.org/members/fcm/regulatory-obligations/annual-fcm-requirements.html (last visited Nov. 8, 2026).

[8] Section 1362 supplies jurisdiction over "all civil actions, brought by any Indian tribe . . . recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1362. Beyond the requirement that the plaintiff be a federally recognized Indian tribe, section 1362 is considered today to be "largely duplicative of the jurisdiction granted by § 1331." 13D Charles Alan Wright *et al.*, Federal Practice & Procedure § 3579 (3d ed. updated April 2026).

federally authorized swaps, and that contention cannot be resolved without construing the CEA and the scope of the CFTC's exclusive jurisdiction.

24. *Second*, Plaintiff's claims rest on its assertion of tribal sovereignty over nonmembers and on rights Plaintiff purports to hold under a compact entered into pursuant to IGRA. These are fundamentally—and unavoidably—federal questions.

**FIRST GROUND FOR REMOVAL: FEDERAL OFFICER REMOVAL**

25. The federal officer removal statute permits DraftKings to have its federal preemption defense heard by a federal court. The Complaint alleges that DraftKings operates a designated contract market, and thus exercises delegated authority under the supervision of the CFTC to carry out functions the CFTC itself would otherwise perform. And Plaintiff's suit directly targets the way DraftKings's prediction market exercises that delegated authority.

26. The federal officer removal statute authorizes removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The Supreme Court has emphasized that "the statute must be 'liberally construed'" and that "[t]he words 'acting under' are broad." *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007). Likewise, "[t]he phrase 'relating to' sweeps broadly," and "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Chevron USA Inc. v. Plaquemines Par.*, 608 U.S. 1, 11 (2026). The Eleventh Circuit has recently recognized as much, noting that "defendants enjoy much broader removal rights under the federal officer removal statute than they do under the general removal statute." *City of Brunswick v. Honeywell Int'l, Inc.*, 184 F.4th 1230, 1243–44 (11th Cir. 2026).

27. Federal officer removal "is an exception to the 'well-pleaded complaint rule,'" allowing "suits against federal officers to be removed despite the nonfederal cast of the complaint." *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006) (alterations adopted). So, when determining whether there is jurisdiction, courts "credit plausible factual allegations by the removing party," *Plaquemines*, 608 U.S. at 12, as well as the *defendant's* "theory of the case," *Town of Pine Hill v. 3M Co.*, 190 F.4th 1314, 1321 (11th Cir. 2026) (citing *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999)). "Section 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.7 (6th Cir. 2010) (alterations adopted) (quoting 14C Charles Alan Wright *et al.*, Federal Practice & Procedure § 3726 (4th ed. 2009)).

28. DraftKings satisfies the three-part test for federal officer removal because (1) it is "a person 'acting under' a federal officer," (2) this suit is "for or relating to any act under color of such office," and (3) it has "a colorable federal defense." *Plaquemines*, 608 U.S. at 6. And because DraftKings is entitled to remove under section 1442, the "entire case" belongs in federal court. *Bennett*, 607 F.3d at 1084 n.7.

29. *First*, DraftKings is a "person acting under" the CFTC. 28 U.S.C. § 1442(a)(1). Corporate entities are persons within the meaning of the statute. *See Pine Hill*, 190 F.4th at 1320 (treating private company as "person" for purposes of § 1442); 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"). And DraftKings acts under the CFTC because it "assist[s]" and "help[s] carry out[] the duties [and] tasks of the" agency. *Pine Hill*, 190 F.4th at 1320.

30. The Complaint alleges that DraftKings operates its prediction market through "Railbird Exchange, LLC, a designated contract market." Compl. ¶ 140. Designated contract

markets are subject to the CFTC's "subjection, guidance, or control" and, through their delegated authority, are "engaged in an effort to assist, or to help carry out, the duties or tasks of the" CFTC, the "federal superior." *Pine Hill*, 190 F.4th at 1320.

31. Start with the extensive federal oversight. Railbird Exchange's continued operation as a designated contract market is dependent on its compliance with the CEA's 23 core principles and all CFTC rules governing access, contract design, surveillance, enforcement, dispute resolution, and customer protection. *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151. The CFTC has "sweeping authority" to enforce the CEA and its regulations. *CFTC v. Schor*, 478 U.S. 833, 836, 842 (1986). The CEA expressly authorizes the CFTC to "review and approv[e] . . . event contracts" and thereby permit those contracts to be "listed" for "trading" on federally registered exchanges. 7 U.S.C. § 7a-2(c)(5)(C). The CFTC may also suspend or revoke the designation of a contract market, *id.* §§ 7b, 8(b), bring administrative enforcement actions, *id.* §§ 9, 13b, and sue in federal court for, among other things, injunctive relief, the rescission of contracts, and the imposition of trading and registration bans, *id.* § 13a-1.

32. The relationship between a contract market and the CFTC, however, goes well beyond that of a highly regulated entity subject to comprehensive supervision. That is because, under the CEA, a contract market performs a task "the government otherwise would have had to perform," *Pine Hill*, 190 F.4th at 1320, namely, regulation of third parties (among other things).

33. To achieve the purpose of the CEA, Congress established "a system of effective self-regulation of trading facilities . . . under the oversight of the Commission." 7 U.S.C. § 5(b). To that end, Congress granted "self-regulatory organizations such as contract markets . . . a form of delegated [government] discretion" to promulgate, implement, and enforce rules governing the market and market participants, *Barry*, 42 F.4th at 625—"regulatory functions" that "the CFTC

would otherwise have to undertake" itself, *Effex Cap., LLC v. Nat'l Futures Ass'n*, 2018 WL 1635851, at *1 (N.D. Ill. Apr. 5, 2018), *aff'd*, 933 F.3d 882 (7th Cir. 2019); *see* 17 C.F.R. § 1.3 (including contract markets within the definition of "self-regulatory organization"); *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) (holding that self-regulatory organization was immune for actions exercising authority "delegated by the SEC"); *DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 99 (2d Cir. 2005) (similar); *Mohlman v. Fin. Indus. Regul. Auth., Inc.*, 2020 WL 905269, at *3–4 (S.D. Ohio Feb. 25, 2020) (collecting cases for same proposition), *aff'd on other grounds*, 977 F.3d 556 (6th Cir. 2020).

34. In their role as self-regulatory organizations, contract markets are delegated a broad array of regulatory functions. For example, a designated contract market is charged with "establish[ing], monitor[ing], and enforc[ing] compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market," and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2).

35. A designated contract market also has the "responsibility to prevent manipulation, price distortion, and disruptions . . . through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C. § 7(d)(4).

36. A designated contract market likewise must "establish and enforce rules" "to protect markets and market participants from abusive practices committed by any party, including abusive practices committed by a party acting as an agent for a participant." 7 U.S.C. § 7(d)(12). These rules, the CFTC has explained, "play" an "important role . . . in promoting the integrity of derivatives markets." CFTC Staff Advisory at 2, CFTCLTR No. 26-08 (Mar. 12, 2026).

37. To implement or revise a rule, a designated contract market must either submit the rule for CFTC approval or certify that the rule complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1). The CFTC may allow the rule to go into effect, or it may stay the rule's certification pending further review. *Id.* § 7a-2(c)(2)–(3).

38. Similarly, to list new event contracts, the contract market must either submit the event contract for CFTC approval or certify that the contract complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A), (5)(C); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). The CFTC retains authority to investigate, stay, or amend the contract after it has been listed. 17 C.F.R. § 40.2(c). If the CFTC determines that a proposed "[e]vent contract" involves certain subjects, including "gaming," it has the discretion to prohibit the listing if the contract would be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

39. And, once those contracts are listed, designated contract markets must "provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process." 7 U.S.C. § 7(d)(9)(A). They must also "establish, monitor, and enforce compliance with" rules relating to "access requirements," *id.* § 7(d)(2)(A)(i), and "establish and enforce rules . . . to promote fair and equitable trading on the contract market," *id.* § 7(d)(12)(B). To that end, CFTC regulations impose additional "impartial access" requirements, mandating that a contract market provide market participants with nondiscriminatory access and adopt and fairly enforce rules governing denials, suspensions, and terminations of access. 17 C.F.R. § 38.151(a)–(c).

40. In all of these respects, a designated contract market exercises authority delegated by the federal government, "helping federal officers fulfill a basic governmental task that the government otherwise would have had to perform." *Pine Hill*, 190 F.4th at 1320 (alteration

adopted). Because the actions of DraftKings's contract market involve "an effort 'to assist, or to help carry out, the duties or tasks of the federal superior,'" the CFTC, the contract market "'act[s] under'" that agency. *Id*.

41. *Second*, Plaintiff's lawsuit relates to actions DraftKings' contract market takes under the authority, supervision, and jurisdiction of the CFTC.

a. Federal law directs DraftKings' contract market to "establish, monitor, and enforce compliance" with "access requirements," 7 U.S.C. § 7(d)(2), and provide "impartial access to its markets and services," including by "establish[ing] and impartially enforc[ing] rules governing denials, suspensions, and revocations" of access, 17 C.F.R. § 38.151(b)–(c). But the Tribe seeks to bar access to DraftKings's federally regulated market by residents of Florida. *See*, *e.g.*, Compl. ¶¶ 1, 187, Prayer for Relief. In other words, the Tribe seeks to *alter* the terms of access for DraftKings's prediction market.

b. Federal law requires DraftKings' contract market to "establish, monitor, and enforce [its users'] compliance" with its rules, including by setting "the terms and conditions of any contracts to be traded on the contract market" and "detect[ing], investigat[ing], and apply[ing] appropriate sanctions" to violators. 7 U.S.C. § 7(d)(2)(A)–(B). But the Tribe takes issue with—and attempts to alter—the types of event contracts offered on DraftKings's platform, alleging that certain contracts are illegal and offering them is unfair and abusive. Compl. ¶¶ 170, 187, 193, 201.

c. Federal law authorizes DraftKings' contract market, subject to comprehensive CFTC oversight, to submit or self-certify event contracts for listing and to offer those contracts on its federally designated contract market. But the Tribe seeks to

impose liability on DraftKings—requesting injunctive relief and disgorgement, among other remedies—based on DraftKings's offering of event contracts anyway. Compl., Prayer for Relief.

d. Federal law requires DraftKings' contract market to "establish, monitor, and enforce [its users'] compliance" with its "rules prohibiting abusive trade practices on the contract market" and to "prevent manipulation" and "price distortion . . . through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C. §§ 7(d)(2)(A), 7(d)(4); *see also* 17 C.F.R. § 38.651 (requiring contract markets to "have and enforce rules that are designed to promote fair and equitable trading and to protect the market and market participants from abusive practices"). But the Tribe disagrees with how DraftKings has done so, and claims that DraftKings lacks adequate consumer safeguards, and that its failure to disclose these alleged shortcomings is deceptive. Compl. ¶¶ 186–87, 191.

e. Federal law also requires DraftKings' contract market to establish and enforce disciplinary procedures and to provide facilities for fair and equitable dispute resolution. 7 U.S.C. § 7(d)(13)–(14). But the Tribe seeks to replace the federal framework with state gambling and consumer-protection remedies and restrictions, including relief premised on the asserted illegality or inadequacy of DraftKings's federally regulated market procedures. Compl. ¶¶ 164–206, Prayer for Relief.

42. In other words, the connection "between [the contract market's] challenged conduct and the performance of its federal duties" is hardly "tenuous, remote, or peripheral"—it is close and direct. *Plaquemines*, 608 U.S. at 12.

43. *Third*, to the extent they rest on the theory that CFTC-regulated event contracts violate state gaming law, Plaintiff's claims are preempted by federal law, which constitutes "a colorable federal defense[]" for purposes of federal officer removal. *City of Brunswick*, 184 F.4th at 1251; *see, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227–28 (3d Cir. 2026) (holding that the CEA preempts the enforcement of state gaming law against contract market offering sports-related event contracts).

44. Preemption follows from the express language of the CEA, which grants "exclusive jurisdiction with respect to" exchange-traded swaps to the CFTC, not state regulators. 7 U.S.C. § 2(a)(1)(A). The CEA assigns the CFTC, not the States, "exclusive authority to enforce the provisions of" federal law concerning swaps. *Id.* § 6b-1. And the CEA authorizes the CFTC, not state regulators, to determine whether event contracts involve "gaming" and may be listed on federally regulated exchanges. *Id.* § 7a-2(c)(5)(C). Through this comprehensive and exclusive regulatory framework, Congress ensured that the CFTC—and no "other regulatory agencies"—would govern national derivatives markets. *Merrill Lynch*, *Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982); *see Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1157 (7th Cir. 1992) (state efforts to interfere with "the operation of a contract market" "are preempted by the CEA").

45. "One of the primary purposes of the removal statute . . . was to have [federal] defenses litigated in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). The statute "guards against the possibility that, in particular cases, a state court's adjudication of a federal officer's defense could 'paralyze the operations of the government,'" *Ohio ex rel. Yost v. Ascent Health Servs., LLC*, 165 F.4th 999, 1004 (6th Cir. 2026) (quoting *Tennessee v. Davis*, 100 U.S. (10 Otto) 257, 263 (1879))—the very harm the CFTC has warned will follow from States'

(or, here, Tribes') efforts to undermine the proper functioning of the CEA through state-court proceedings, *see* 91 Fed. Reg. at 65976.

46. This case exemplifies the danger federal officer removal was designed to prevent. Plaintiff—purporting to act both as regulator and competitor—seeks to enjoin DraftKings from offering or facilitating the offering of event contracts on a federally regulated designated contract market to Floridians. That effort risks fracturing national derivatives markets and undermines the uniformity Congress sought to achieve through "a system of effective self-regulation of trading facilities . . . under the oversight of the [CFTC]." 7 U.S.C. § 5(b). Congress enacted federal officer removal precisely to "protect the Federal Government" and those "'who lawfully assist'" it from such "interference with [their] operations." *Watson*, 551 U.S. at 150 (citation omitted).

47. This Court should recognize its jurisdiction under section 1442(a)(1) to ensure that DraftKings's preemption defense is fairly and fully litigated.

**SECOND GROUND FOR REMOVAL: FEDERAL QUESTION JURISDICTION**

**A. Event Contracts Under Federal Law**

48. This case also belongs in federal court because it necessarily turns on disputed and substantial questions of federal law. *See* 28 U.S.C. §§ 1331, 1362.

49. Plaintiff's claims require the adjudication of federal-law issues that are "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005)).

50. Plaintiff's claims necessarily require proof that the event contracts at issue are illegal gambling—and those claims cannot be adjudicated without deciding disputed and substantial questions of federal law.

51. DraftKings operates a lawful, nationwide designated contract market subject to the exclusive jurisdiction of the CFTC. Likewise, GUS III operates a lawful, federally regulated FCM. The core question is whether Plaintiff may nonetheless recover under state laws, based on the supposed unlawfulness of contracts traded on that exchange or through that FCM. That question cannot be answered without interpreting the scope and effect of the CFTC's exclusive jurisdiction under the CEA.

52. The CFTC has confirmed through litigation, amicus briefs, and public statements that event contracts traded on designated contract markets are lawful and fall squarely within the agency's exclusive federal authority. *See*, *e.g.*, Complaint, *United States v. Utah*, No. 2:26-cv-01055 (D. Utah Oct. 26, 2026), Dkt. 1. Courts have granted requests from the CFTC and others to enjoin state interference with event-contract markets. *See United States v. Minnesota*, 2026 WL 2150211, at *1 (D. Minn. July 27, 2026); *Coinbase Fin. Mkts., Inc. v. Raoul*, 2026 WL 2969682, at *18 (N.D. Ill. Oct. 2, 2026). And the Third Circuit has agreed that regulatory authority over event contracts belongs to the CFTC, not the States. *See Flaherty*, 172 F.4th at 228.

53. Plaintiff does not dispute that DraftKings's prediction market and GUS III are federally licensed or that the CFTC has authorized the listing of DraftKings's event contracts. But Plaintiff insists that it—not Congress or the CFTC—can tell which federally regulated offerings are truly "authorized" and which are "illegal." Compl. ¶¶ 6, 34. Plaintiff does not explain how much of the Nation's trillion-dollar derivatives industry it believes is subject to Florida's gambling

laws and tribal oversight. Instead, it focuses on the sports-related event contracts offered by DraftKings's prediction market. *See id.* ¶¶ 4, 60, 89, 95–105.

54. These kinds of contracts, however, are an especially unusual choice of target: As Plaintiff concedes, "[p]rediction markets have existed for decades as instruments for hedging commodity and financial risk" and "serve[] a legitimate informational function." Compl. ¶ 95. And federal law expressly entrusts the CFTC—not Plaintiff (or the State of Florida)—with the task of determining whether swaps "involve . . . gaming." 17 C.F.R. § 40.11(a); *see* 7 U.S.C. § 7a-2(c)(5)(C) (similar); *Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35806, 35815–16, 35835–37, 35853, 35870–71 (June 12, 2026) (setting out the CFTC's view that sports-related event contracts may be listed on designated contract markets and proposing new regulations to supply further clarity); *Further Definition of "Swap"—Inclusions*, 91 Fed. Reg. 66022, 66027 (Oct. 19, 2026) (same).

55. Yet all of Plaintiff's claims boil down to its theory that Defendants are engaged in illegal gambling. *See* Compl. ¶¶ 168, 174–79, 186, 191, 197. Take, for example, Plaintiff's standalone claim under Chapter 849. *Id.* ¶¶ 164–70. Plaintiff brings that claim under section 546.10(8)(a), which permits certain parties to sue "to enjoin the operation of any game or machine pursuant to or for an alleged violation of this section or chapter 849." Fla. Stat. § 546.10(8); *see* Compl. ¶ 166. Section 849.26, on which Plaintiff relies, *see* Compl. ¶¶ 39, 94 n.40, declares gambling contracts "void and of no effect," Fla. Stat. § 849.26. But that section does "not apply" to any "transaction *expressly authorized by law*." *Id.* (emphasis added).

56. The party invoking that provision bears the burden of establishing its application—*i.e.*, that the transaction is "barred" because it is not expressly authorized by law. *Wallisville Corp. v. McGuinness*, 154 So. 3d 501, 504 (Fla. Dist. Ct. App. 2015).

57. To succeed on its Chapter 849 claim, then, Plaintiff must prove that DraftKings's event contracts are unlawful "bet[s]" or "wager[s]"—not lawful transactions on a federally regulated exchange. Fla. Stat. §§ 849.14, 849.25(1)(a), 849.26.

58. Carrying that burden necessarily requires Plaintiff to contend with federal law. *See World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 521 (4th Cir. 2015) ("Florida law must be deemed to include United States law—by case law or by statute.").

59. "As a result, whether the contracts at issue are unlawful gambling contracts—or instead federally authorized event contracts—cannot be resolved by reference to [state] law alone." *Ga. Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375, at *3 (M.D. Ga. Feb. 3, 2026); *cf. Handy Land & Timber, LLLP v. Transcon. Gas Pipe Line Co.*, 762 F. App'x 810, 812–13 (11th Cir. 2019) (federal issue necessarily raised where state-law claims required showing that a federal certificate "did not authorize" the challenged conduct).

60. Under the CEA, which governs the contracts' validity, the event contracts at issue are authorized, lawful swaps. *Cf. Fiberlink Commc'ns Corp. v. Magarity*, 24 F. App'x 178, 182 (4th Cir. 2001) ("The law governing a contract is the law relating to the validity and interpretation of the contract itself, rather than the law regarding performance and breach."). The CEA defines "swap" broadly, 7 U.S.C. § 1a(47)(A), as any contract "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," *id.* § 1a(47)(A)(ii), or "that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap," *id.* § 1a(47)(A)(iv). As the CFTC has confirmed, DraftKings's event contracts satisfy both definitions. Sports-based event contracts are associated with a "potential financial, economic, or commercial consequence." *Flaherty*, 172 F.4th at 227; *see* 91 Fed. Reg. at 65974. Those

contracts are also "overwhelmingly recognized" by the market as "swaps" and thus fall within the section 1a(47)(A)(iv) definition. 91 Fed. Reg. at 66027. The CFTC has the authority to determine whether a listed contract "involve[s]" "gaming" and, if so, whether to prohibit the listing. 7 U.S.C. § 7a-2(c)(5)(C)(i). But the CFTC has not prohibited the listing of any event contracts relevant here.

61. In fact, Plaintiff acknowledges that DraftKings's event contracts are listed on a "designated contract market," Compl. ¶ 140, and offered through "a CFTC-registered Futures Commission Merchant and NFA member," *id.* ¶ 90—which are "presumptively approved under federal law." *Flaherty*, 172 F.4th at 227.

62. Establishing that DraftKings's event contracts are unlawful bets or wagers under Chapter 849 therefore "necessarily depends on the interpretation and application of the CEA and the scope of the CFTC's exclusive jurisdiction." *Ga. Gambling*, 2026 WL 279375, at *3. In other words, Plaintiff's "'right to relief necessarily depends on resolution of a substantial question of federal law.'" *Hill v. Bellsouth Telecomms., Inc.*, 364 F.3d 1308, 1314 (11th Cir. 2004).

63. Plaintiff appears to concede that whether the challenged event contracts are "illegal" gambling instead of federally authorized "swaps" under the CEA is necessarily part of its claim: Plaintiff devotes an entire section of the Complaint to the legality of Defendants' swaps under the CEA. *See* Compl. ¶¶ 95–105. There, it argues that "[t]he Super App sportsbook," which is how Plaintiff describes the prediction-market platform, "differs from a genuine prediction market." *Id.* ¶ 97. Plaintiff's own framing thus confirms that the federal question lies at the heart of its claim.

64. Plaintiff also asserts a Florida RICO claim predicated on violations of Chapter 849, Florida Statutes. *See* Compl. ¶¶ 175–78. For the same reasons that establishing illegality under

Plaintiff's standalone gambling-law claims requires looking to federal law, so does its RICO claim. *See Vickery v. State*, 539 So. 2d 499, 502 (Fla. Dist. Ct. App. 1989) ("[A] RICO violation generally involves two separate offenses: the first, the defendant's commission of the predicate offenses," and "the second, the defendant's participation in a pattern of criminal activity.").

65. Plaintiff's claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and for common law unfair competition similarly raise a federal question. Plaintiff alleges that Defendants engaged in "deceptive and unfair acts and practices" by marketing prediction markets "when those products in fact violate Florida law and the Compact" and by representing they "are legal . . . sports wagering in Florida, when in truth those products violate Florida law and the Compact." Compl. ¶¶ 186, 191.

66. Both claims require Plaintiff to prove deceptive conduct. *See Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1097–98 (11th Cir. 2021) (FDUTPA); *Al Rushaid Petroleum Invs. Co. v. Siemens Energy Inc.*, 159 F.4th 887, 898 (11th Cir. 2025) (unfair competition). And Plaintiff's theory of deception in turn rests on the premise that Defendants' offerings "in fact violate Florida law." Compl. ¶¶ 186, 191. Whether that premise holds turns on the same question that Plaintiff's Chapter 849 claim presents: whether the event contracts are unlawful wagers, or instead lawful transactions under the CEA. *See supra* ¶¶ 55–63.

67. Further, the FDUTPA does not apply to an "act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1). Plaintiff's own allegations confirm that DraftKings's prediction market operates as a designated exchange under the CFTC's exclusive jurisdiction. *See* Compl. ¶¶ 90, 140; *see Prohias v. AstraZeneca Pharms., L.P.*, 958 So. 2d 1054, 1056 (Fla. Dist. Ct. App. 2007) (complaint confirmed that challenged act was permitted by state law).

68. In short, each of Plaintiff's claims turns on whether federal law authorizes the event contracts at issue, a question that the federal government has vigorously litigated and that has divided the federal courts of appeals. *See Flaherty*, 172 F.4th at 226; *KalshiEX, LLC v. Assad*, 190 F.4th 1098, 1107–08, 1122 (9th Cir. 2026). Allowing a state court to adjudicate the legality of federally regulated swaps would fracture national derivatives markets and undermine the uniformity Congress deemed essential by granting the CFTC exclusive jurisdiction over these markets. Upholding federal jurisdiction here does not disrupt the federal-state balance; it enforces it.

**B. Tribal Sovereignty and Federal Authority**

69. Because "federal law regulates a tribe's right to exercise authority over non-Indians," *Ute Indian Tribe v. Lawrence*, 875 F.3d 539, 542 (10th Cir. 2017), "a dispute over tribal sovereignty . . . is a matter of federal law to which § 1331 applies," *Miccosukee Tribe of Indians of Fla. v. Kraus-Anderson Constr. Co.*, 607 F.3d 1268, 1275 (11th Cir. 2010).

70. Similarly, because "a gaming compact" is "a creation of federal law," *Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226, 1239 (10th Cir. 2018), cases involving the "meaning" or "enforce[ment]" of a "compact" arise under federal law—as Plaintiff itself has argued, *Seminole Tribe of Fla. v. Florida*, 2016 WL 3128383, at *2 (N.D. Fla. Jan. 6, 2016) (successfully asserting jurisdiction under section 1362); *see Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1056 (9th Cir. 1997) (finding jurisdiction under sections 1331 and 1362 because "[c]ompacts quite clearly are a creation of federal law" and "IGRA prescribes the permissible scope of the [c]ompacts").

71. Both principles are implicated here. Even on tribal land, Tribes have limited authority "over non-Indians," save for certain powers "necessary to protect" tribal "sovereign

authority." *Montana v. United States*, 450 U.S. 544, 564–65 (1981). When it comes to "civil authority over nonmembers *on non-Indian land*," tribal dominion is practically nonexistent. *Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 333 (2008). Establishing that authority requires a Tribe to identify a congressional exercise of the federal government's "'plenary and exclusive power'" "to legislate in the field of Indian affairs." *United States v. Lara*, 541 U.S. 193, 200–01 (2004). Unsurprisingly, then, the Complaint relies heavily on notions of tribal sovereignty and the Compact Plaintiff entered into under IGRA—mentioning the Compact alone at least 100 times.

72. Plaintiff claims the right to sue on the ground that it is "a federally recognized tribal government possessing sovereign powers and rights of self-governance which is a party to a compact with the state." Compl. ¶¶ 15, 166 (quoting Fla. Stat. § 546.10(8)(a)); *see id.* ¶¶ 2, 10, 24 (similarly invoking Plaintiff's status as a "sovereign"). Plaintiff also asserts that its right to sue comes from "the Compact" it entered into with Florida. *Id.* ¶ 167; *see id.* ¶¶ 15, 166 (similar). According to Plaintiff, the Compact is a "sovereign government-to-government instrument negotiated *pursuant to federal law*." *Id.* ¶ 162 (emphasis added); *see id.* ¶ 24 (similar).

73. Throughout the Complaint, Plaintiff alleges that Defendants have "violate[d] . . . the Compact," *see* Compl. ¶¶ 60, 128, 154(a), 186, 191, by interfering with the exclusivity over "mobile sports betting" purportedly granted by "the Compact," *id.* ¶ 32; *see id.* ¶¶ 19, 74, 152, 162, 168 (similar). Plaintiff describes the grant of exclusivity as a "legal right . . . under the Compact." *Id.* ¶ 201. Expressly invoking federal law, Plaintiff maintains that this supposed exclusivity is lawful because "[t]he Compact was approved pursuant to the Indian Gaming Regulatory Act." *Id.* ¶ 2. In an effort to establish that some of Defendants' offerings are unlawful, Plaintiff advances its interpretation of the terms of and exceptions to the Compact. *Id.* ¶ 75. Plaintiff claims to have

been injured because it is "the only entity authorized under . . . the Compact to offer online sports wagering in Florida." *Id.* ¶ 187. And Plaintiff sues "to enforce [these] exclusive rights under the Compact." *Id.* ¶ 9. To that end, Plaintiff asks for an injunction preventing Defendants from operating "any sports wagering activity in Florida outside the Compact." *Id.* ¶ 170.

74. All told, "[t]he Tribe is seeking to establish the right to operate its [sports] gaming [monopoly] free from [Defendants'] interference. That right, if it exists, is a federal right whether its source is IGRA, the Compact, the Indian Commerce Clause or federal recognition of the inherent sovereign powers of an Indian tribe." *Forest Cnty. Potawatomi Cmty. of Wis. v. Norquist*, 45 F.3d 1079, 1082 (7th Cir. 1995). And "'[t]he federal nature of the right to be established is decisive' of whether the action arises under federal law." *Id.* (quoting *Gully v. First Nat'l Bank*, 299 U.S. 109, 116 (1936)).

**ALL REMOVAL REQUIREMENTS ARE MET**

75. Based on the foregoing facts and allegations, this Court has jurisdiction over this action because Plaintiff's claims are for or relating to actions that DraftKings took under color of federal office.

76. Based on the foregoing facts and allegations, this Court also has original jurisdiction over this action because the Complaint arises under federal law and necessarily raises substantial, disputed federal questions that belong in a federal court.

77. Venue is proper in this Court because the United States District Court for the Southern District of Florida is the federal judicial district embracing the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, where Plaintiff originally commenced the state-court action. 28 U.S.C. §§ 1441(a), 1446(a).

78. Removal is timely because DraftKings was served on October 15, 2026. 28 U.S.C. § 1446(b)(1), (2)(B); *see* Exhibit 7.

79. All named Defendants—DraftKings, Jason Robins, and GUS III LLC d/b/a DraftKings Predictions—consent to removal.

80. A copy of Plaintiff's Complaint is attached hereto as Exhibit 1, along with all other filings and the state-court action docket sheet as Exhibits 2–12, which collectively make up the entire state-court file. 28 U.S.C. § 1446(a).

81. DraftKings will provide Plaintiff with written notice of this filing and will promptly file a true and correct copy of this Notice of Removal with the Clerk of the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida. The Notice of Filing of Notice of Removal to be filed is attached as Exhibit 13. *See* 28 U.S.C. § 1446(d).

82. By filing this Notice of Removal, Defendants do not waive any objections as to notice, service, personal jurisdiction, venue, or any other defenses. Defendants reserve all of their defenses, and this Notice of Removal is filed subject to full reservation of any rights and all objections, arguments, and defenses to Plaintiff's Complaint.

## CONCLUSION

83. Defendants hereby remove this action and respectfully request that the Court retain jurisdiction for all further proceedings in this matter.

Dated: November 9, 2026

Respectfully submitted,

/s/ Joseph W. Jacquot
George S. Lemieux (Fla. Bar No. 16403)
GUNSTER, YOAKLEY & STEWART, P.A.
450 E. Las Olas Blvd., Suite. 1400
Fort Lauderdale, Florida 33301
Telephone: (954) 462-2000
Primary: glemieux@gunster.com
Secondary: rbelons@gunster.com

Joseph W. Jacquot (Fla. Bar No. 189715)
GUNSTER, YOAKLEY & STEWART, P.A.
1 Independent Drive, Suite 2300
Jacksonville, Florida 32202
Telephone: (904) 354-1980
Primary: jjacquot@gunster.com
Secondary: wpruim@gunster.com

Orin Snyder*
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
osnyder@gibsondunn.com

Jacob T. Spencer*
Adam I. Steene*
Abby H. Walters*
GIBSON DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
jspencer@gibsondunn.com
asteene@gibsondunn.com
ahwalters@gibsondunn.com

Richard Patch*
Charmaine G. Yu*
Sarah Paterson*
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, California 94104
Telephone: (415) 391-4800

**Applications for pro hac vice admission forthcoming*

*Attorneys for Defendants DraftKings Inc., GUS III LLC, and Jason Robins*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2026, I filed this document and all exhibits through the CM/ECF system and that notice will be electronically sent to all registered participants identified in the Notice of Electronic Filing, that paper copies will be sent via First-Class Mail to all non-registered participants, and that copies will be sent by electronic mail to the following:

Jason D. Sternberg & Erica L. Perdomo
QUINN EMANUEL URQUHART & SULLIVAN, LLP
2601 South Bayshore Drive, Suite 1550
Miami, Florida 33133
jasonsternberg@quinnemanuel.com
ericaperdomo@quinnemanuel.com

Derek L. Shaffer & Keith H. Forst
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
derekshaffer@quinnemanuel.com
keithforst@quinnemanuel.com

Alex H. Loomis
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
alexloomis@quinnemanuel.com

B. Dylan Proctor
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
dylanproctor@quinnemanuel.com

Joseph H. Webster
Jens W. Camp
HOBBS, STRAUS, DEAN & WALKER, LLP
1899 L Street NW, Suite 1200
Washington, D.C. 20036
jwebster@hobbsstraus.com

*Attorneys for Plaintiff the Seminole Tribe of Florida*

*/s/ Joseph W. Jacquot*
Joseph W. Jacquot