# EXHIBIT 1

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 1 of 72

**IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT**
**IN AND FOR BROWARD COUNTY, FLORIDA**

THE SEMINOLE TRIBE OF FLORIDA,

Plaintiff,

v.

DRAFTKINGS, INC., JASON ROBINS, and GUS III LLC d/b/a DRAFTKINGS PREDICTIONS,

Defendants.

Case No.:

**COMPLAINT**

1. Plaintiff, the Seminole Tribe of Florida (the "Tribe"), brings this suit to enjoin Defendants from offering an illegal sportsbook in Florida in violation of Florida law. Defendants openly advertise that they offer a sportsbook throughout Florida. But they hide from the public that their sportsbook is illegal. Every wager that Defendants now accept through their illegal sportsbook siphons away revenue that funds both the Tribe's and Florida's public programs and government services; diverts betting from Florida's regulated system into an underground, unregulated, and outlawed book; and deprives the Floridian who places such a bet of the consumer protections guaranteed by Florida law. Defendants brazenly admit their scheme to investors. Defendant Jason Robins—who exercises complete control over Defendant DraftKings, Inc. and its wholly owned subsidiary Defendant GUS III LLC, and masterminds their illegal gambling operations—has crowed that customers of DraftKings' illegal operation "are experiencing losses more quickly" than legal gamblers.[1] He has also denied that there is any distinction between the type of bets Defendants offer in Florida and those that they offer in States where DraftKings is

[1] *First Quarter 2026 Business Update*, DraftKings, at 3, https://perma.cc/PL5Z-LP75.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 2 of 72

licensed to operate, noting that customers "do not really even understand the difference," and that it is "irresponsibl[e]" for anyone to claim that there is one.[2] Robins used to say that he wanted "a safe, *legal, regulated*, and competitive market for online sports betting in" Florida.[3] But he has abandoned that goal, admitting in August that Defendants' business strategy now turns on "*the states [where] we don't have legal sports betting*."[4] Florida law grants the Tribe a cause of action to enjoin illegal gaming operations like those of DraftKings, and the Tribe is coming before this Court to vindicate its rights and to enforce Florida law. § 546.10(8)(a), Fla. Stat. The Tribe therefore respectfully asks this Court to enjoin Defendants' criminal profiteering, order disgorgement, and award the Tribe its attorneys' fees and costs.

2. When Florida legalized sports betting in 2021, it did so through the 2021 Gaming Compact (the "Compact"), a historic government-to-government agreement between the Tribe and the State, entered into after lengthy negotiations. The Compact was approved pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2710, and entrusts the Tribe—a federally recognized sovereign nation with deep Florida roots and decades of experience as a proven responsible gaming operator—with the exclusive right and responsibility to offer sports betting to Floridians. All other sports betting operations in Florida are illegal. This framework was created, with great deliberation and care, to protect Florida consumers, including younger Floridians.

---

[2] *DraftKings (DKNG) Q4 2025 Earnings Call Transcript*, The Globe and Mail (Feb. 13, 2026), https://perma.cc/6QF8-UU9F; Daniel O'Boyle, *DraftKings CEO: Some Operators 'Irresponsibly' Overstating Difference Between Predictions And Sportsbook*, InGame (May 8, 2026), https://perma.cc/W278-TPDD; *DraftKings Inc. (DKNG) Q1 FY2026 earnings call transcript*, Yahoo! Finance (May 8, 2026), at 35:13, https://perma.cc/JW7U-7AL6.

[3] *DraftKings Inc. (DKNG) Q2 2021 Earnings Call Transcript*, Motley Fool (Aug. 6, 2021), https://perma.cc/K6HP-D72W (emphasis added).

[4] Julie Hyman, *Expect 'big things' this fall: DraftKings CEO on prediction markets growth*, Yahoo! Finance (Aug. 7, 2026), at 1:32-1:47, https://tinyurl.com/r2ppbss8 (emphasis added).

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 3 of 72

Rigorous safeguards attend the Compact, including state oversight and auditing, age verification, protections against problem gambling and money laundering, and a ban on collegiate proposition bets. In return for the State's grant of exclusive gaming rights, the Tribe agreed to make revenue-sharing payments to the State, including an unprecedented guaranteed minimum of $2.5 billion over the Compact's first five years and billions more projected over the rest of its term.

3. In a direct affront to the Tribe and the State, Robins directed DraftKings to mount a multifaceted campaign to dismantle Florida's gaming laws and undermine the Tribe's rights under the Compact. DraftKings first tried to buy itself legal access to the Florida market, spending more than $20 million on a ballot initiative to undermine the Tribe's exclusive rights. But that ballot initiative failed, as did a series of lawsuits that DraftKings secretly funded for years—one that ended in a denial of review by the U.S. Supreme Court, a second that ended in a denial of review by the Florida Supreme Court, and a third that DraftKings filed in Florida state court in September 2026. Despite Defendants' efforts, Florida's gambling laws, and the Compact that gives the Tribe exclusive rights, remain in full force and effect.

4. Having failed to change Florida law through the ballot box and the courts, DraftKings—acting at the direction and under the control of Defendant Jason Robins—has now pivoted to proceeding as though the law, the Compact, and the Tribe's exclusive rights simply do not exist. In January 2026, Robins directed the launch of "Pick6" in Florida, a gambling product that illegally offers player-proposition bets that are reserved exclusively to the Tribe. And in June 2026, Robins directed the launch of DraftKings' "Super App," branded "DraftKings Sports & Casino," which includes an illegal sportsbook (the "Super App sportsbook"), powered behind the scenes by a so-called "prediction market," along with an advertising campaign trumpeting that "DraftKings Sports" is "Now Live in Florida!" The Super App sportsbook offers Florida

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 4 of 72

consumers everything a traditional sportsbook would—game lines, moneylines, point spreads, over/unders, player props, and parlays—without any license or state oversight, replicating the sportsbook that DraftKings offers in States where it is licensed. Pick6 and the Super App sportsbook together constitute Defendants' "Illegal Sports Gambling Offerings."

5. These Illegal Sports Gambling Offerings functionally replicate the sportsbook that DraftKings offers in States where sports betting is legal and DraftKings is licensed. That is by design: in deciding where to launch its Illegal Sports Gambling Offerings around the country, Robins specifically directed DraftKings to focus on "states that do not have legal online sports betting."[5] Of course, Florida does have legal, regulated online sports betting; Defendants are simply not entitled to offer a sportsbook under Florida law. Tellingly, Defendants deliberately withhold their Illegal Sports Gambling Offerings from States where DraftKings holds a license, fearing that launching in those States would, in Robins' words, "upset regulators that we have great relationships with."[6] Defendants, by contrast, have no issue undermining the Compact and Florida law.

6. Ever since the release of its illegal Super App sportsbook, DraftKings has blanketed the State with ads calculated to dupe consumers into believing that its gambling operations are legal and regulated. In fact, every wager placed on that sportsbook is illegal, and all of the advertisements DraftKings and Robins are pumping into Florida are inducing Floridians to violate state law. DraftKings cynically buries disclaimers in its fine print that purport to shift all legal risk

---

[5] *See* Dustin Gouker, *Everything DraftKings' CEO Just Said About Prediction Markets*, The Event Horizon (Sept. 8, 2025), https://perma.cc/T3ER-DUAD.

[6] Jeff Edelstein, *Jason Robins: Prediction Markets Are A Gamble, iCasino On Upswing, And More*, InGame (Nov. 7, 2025), https://perma.cc/AEA8-LBSN.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 5 of 72

for engaging in illegal gambling to Florida consumers—exposing ordinary Floridians to criminal liability while DraftKings claims a right to keep its illegal profits.

7. As directed by Robins, DraftKings has joined the disreputable ranks of other criminal organizations running illegal sportsbooks in the State of Florida in violation of Florida law and in derogation of the Tribe's rights under the Compact. What distinguishes Defendants from the rest are the remarkable facts that Defendants advertise their criminality and congratulate themselves on the absence of any regulatory oversight. Their operation is no less criminal. The Super App sportsbook is intended to ignore Florida's regulatory framework and directly undermine the Compact. DraftKings has not submitted its operations to the State for oversight, and, as an illegal gambling business, evades the auditing, age verification, anti-money-laundering, and responsible-gaming requirements that Florida demands. DraftKings also offers its illegal products in Florida to those between the ages of eighteen and twenty-one, despite knowing that Florida's minimum sports betting age is twenty-one. This is all profit-driven: Robins disclosed earlier this year that customers of DraftKings' Illegal Sports Gambling Offerings "are experiencing losses more quickly" than legal gamblers.[7] Defendants have, in short, declared open season on vulnerable Floridians.

8. Robins has also bragged that the Super App's operations in States where it is unlicensed, like Florida, are "one of [DraftKings'] fastest to profitability business lines … ever launched."[8] Indeed, unlike the Tribe—which shares revenue with the State—Robins has structured DraftKings' operations to avoid paying even a penny in taxes to the State. Robins and DraftKings have trumpeted this illegality, stating that tax avoidance is the "main thing" behind the

[7] *First Quarter 2026 Business Update*, *supra* note 1, at 3.

[8] *DraftKings Inc. (DKNG) Q1 FY2026 earnings call transcript*, *supra* note 2, at 23:04.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 6 of 72

Super App's outsized margins.[9] Every dollar a Floridian wagers with DraftKings is a dollar diverted from Florida's regulated market, thus depriving Floridians of revenue that would otherwise fund schools, environmental and water-management programs, local governments, and law enforcement. It is also a dollar diverted from the Tribe, which uses its gaming revenue to fund public services for its members, and which paid, at great expense, for exclusive gaming rights in the State of Florida.

9. The Tribe now brings this lawsuit to enforce Florida's gaming laws and its exclusive rights under the Compact—a responsibility the Florida Legislature has expressly entrusted to the Tribe. The Court should not permit Robins and DraftKings' illegal conduct to continue. Instead, it should shut down Defendants' Illegal Sports Gambling Offerings in Florida and order disgorgement of the unlawful profits that Defendants have reaped. The Tribe pledges to prioritize funds obtained in this litigation to serve the public interests embodied by the Compact, including consumer-protection programs and problem-gambling treatment, prevention, and recovery for the at-risk gamblers who are the worst victims of Defendants' conduct—so that all Floridians benefit from seeing Florida law enforced.

## PARTIES

10. The Tribe is a sovereign, federally recognized Indian tribe whose government is seated on the Hollywood Seminole Reservation.

11. DraftKings is a publicly traded corporation headquartered in Boston, Massachusetts. DraftKings operates one of the largest online sports betting platforms in the United States, reporting nearly $6.1 billion in total revenue in fiscal year 2025. DraftKings holds sports

---

[9] *DraftKings CEO on launch of new 'super app,' prediction markets and more*, CNBC Television (YouTube, Mar. 2, 2026), at 01:41, https://tinyurl.com/3tkhd43c.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 7 of 72

betting licenses in approximately 27 States and Washington, D.C. DraftKings has no license to conduct any form of gambling, including sports wagering, in Florida.

12. Defendant Jason Robins, a resident of Massachusetts, is the co-founder, Chief Executive Officer, Chairman of the Board, and controlling stockholder of DraftKings.

13. Defendant GUS III LLC d/b/a DraftKings Predictions ("DraftKings Predictions") is a wholly owned subsidiary of DraftKings, headquartered in Boston, Massachusetts.

**JURISDICTION AND VENUE**

14. This case qualifies for assignment to the Complex Business Division, Admin. Order No. 2025-22-Civ, because the issues are complex, discovery will likely be extensive, there are numerous parties and potential parties, the amount in controversy exceeds $250,000, and the dispute involves the sale of goods or services by or to business entities.

15. This Court has subject matter jurisdiction because each Count is within the original jurisdiction of the circuit courts under § 26.012, Fla. Stat.; the amount in controversy exceeds $50,000, exclusive of interest, costs, and attorneys' fees; and the Complaint seeks equitable relief, including any and all injunctive and declaratory relief, over which the circuit courts have original jurisdiction. § 546.10(8)(a), Fla. Stat., specifically authorizes "a federally recognized tribal government possessing sovereign powers and rights of self-governance which is a party to a compact with the state" to bring "an action to enjoin the operation of any game or machine pursuant to or for an alleged violation of … chapter 849" of the Florida Statutes.

16. This Court has personal jurisdiction over Jason Robins, DraftKings, and DraftKings Predictions consistent with Florida's long-arm statute, § 48.193, Fla. Stat., and due process.

17. Each Defendant operates a business or business venture in Florida, purposefully directing commercial activity at Florida residents. Each operates platforms accessible to Florida

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 8 of 72

users, advertises extensively within Florida, and derives substantial revenues from Floridians through the Illegal Sports Gambling Offerings.

18. Robins has also engaged in activities related to this Complaint while physically present in Florida. He has repeatedly traveled to Florida to pressure the Tribe to work with DraftKings. And upon information and belief, Robins has directed both DraftKings and DraftKings Predictions from Florida, where he frequently visits family, regularly conducts business, and, upon information and belief, owns a house.

19. Robins is sued for his own intentional and tortious conduct, expressly aimed at Florida and calculated to cause injury there: he personally decided that DraftKings would solicit and accept wagers from Florida residents notwithstanding the Compact, and personally identified Florida as a target market for the products at issue.

20. Through the Illegal Sports Gambling Offerings, Defendants cause injury to persons in Florida and commit tortious acts in Florida by soliciting and accepting illegal gambling wagers.

21. Venue is proper because Defendants are non-residents who are subject to personal jurisdiction consistent with constitutional considerations, and they therefore can "be sued in any county in this state." *Holton v. Prosperity Bank of St. Augustine*, 602 So. 2d 659, 662 n.2 (Fla. 5th DCA 1992) (citation omitted).

22. Venue is also proper because the causes of action accrued in Broward County. § 47.011, Fla. Stat. Defendants offer and advertise their Illegal Sports Gambling Offerings in Broward County. Every illegal wager accepted from a Broward resident is a discrete act occurring in this County.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 9 of 72

23. DraftKings has also blanketed Broward County, and in particular the areas around the Tribe's Hollywood Seminole Reservation, with billboards and viral marketing on cars and coasters advertising "DraftKings Sports NOW IN FLORIDA" and "Let's Ride, Florida."

## FACTS

### A. Florida's Deliberate Policy Choice: The 2021 Gaming Compact

24. The Compact represents decades of government-to-government negotiations between two sovereigns, culminating in a successful, safe, and regulated gaming industry in Florida.

25. Only after years of careful deliberations did Florida decide to authorize online sports betting under the Tribe's exclusive authority, upon concluding that legal sports betting in the State should proceed through a single, accountable, heavily regulated operator: the Tribe. This approach, as embodied in the Compact, ensures comprehensive regulatory oversight, robust consumer protections, and revenue sharing that would fund public programs.

26. In April 2021, Florida Governor Ron DeSantis and Seminole Chairman Marcellus Osceola, Jr. signed the historic 30-year Compact. The Florida Legislature ratified it with overwhelming bipartisan majorities. Following ratification, the Compact was submitted to the United States Secretary of the Interior, who allowed the Compact to be approved under IGRA. Notice of the approval was published in the Federal Register, making the Compact effective.

27. Governor DeSantis touted the Compact as "historic," noting that it "expands economic opportunity, tourism, and recreation, and bolsters the fiscal success of our state in one fell swoop for the benefit of all Floridians and Seminoles alike."[10]

---

[10] *Governor Ron DeSantis Strikes Historic Gaming Compact With Seminole Tribe of Florida*, Exec. Off. of the Governor (Apr. 23, 2021), https://perma.cc/4A43-R5QV.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 10 of 72

28. The Compact delivers on the Governor's billing by pairing legal sports betting with robust consumer protections and a financial commitment to the State. Those protections include, without limitation:

a. ***Independent State Oversight and Auditing.*** The Tribe helps to fund the Florida Gaming Control Commission, which serves as the State Compliance Agency ("SCA") under the Compact. The Tribe currently pays the SCA over $600,000 annually.

b. ***Age Verification.*** No person under twenty-one may participate in sports betting. The Tribe utilizes a registration process that validates a player's identity and age before he or she may place any wager.

c. ***Problem-Gambling Protections.*** The Tribe is required to maintain a comprehensive program to combat problem gambling, including:

(i) training all gaming employees who interact with patrons to identify warning signs of compulsive gambling and direct patrons to assistance;

(ii) maintaining a self-exclusion registry for patrons who voluntarily acknowledge their vulnerability to compulsive gambling;

(iii) making printed and online materials available directing patrons to the State's compulsive gambling 24-Hour Helpline; and

(iv) donating at least $250,000 per facility annually to a state-designated entity to address compulsive gambling.

d. ***Anti-Money-Laundering Protocols.*** The Tribe is required to implement anti-money-laundering protocols to verify the source of funds used for electronic wagers.

e. ***Restricted-Patrons List.*** The Tribe maintains a list of "Restricted Patrons" who are categorically prohibited from sports betting.

f. ***Suspicious-Activity Reporting.*** When suspicious activity occurs, the Tribe must immediately report it to both the Seminole Tribal Gaming Commission ("STGC") and the SCA.

g. ***Geo-Fencing.*** The Compact requires geo-fencing technology to ensure that only persons physically located within Florida can place online wagers.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 11 of 72

h. ***Prohibition On Collegiate Prop Bets.*** The Compact does not permit proposition bets on collegiate sports. A "proposition bet," or "prop bet," is a wager on specific, individual events or milestones within a game rather than the final outcome, such as an individual player's statistical performance.

29. The STGC has promulgated extensive regulations to implement the Compact. These regulations go even further than the Compact's baseline requirements by, among other things, imposing stringent anti-money-laundering and know-your-customer requirements, guaranteeing patrons their right to withdraw funds promptly, and extending state-of-the-art responsible gaming protections.

30. Under the Compact, the Tribe also agreed to make substantial revenue-share payments to the State, including a minimum of $2.5 billion over the first five years of the Compact. Over the Compact's current 30-year term, the Tribe will make billions more in payments, funding public services including environmental, conservation, and water-management projects, as well as distributions to local governments.

31. In exchange for implementing these comprehensive safeguards and substantial revenue-share payments, the Tribe receives the exclusive right to offer online sports betting throughout the State of Florida.

32. Part III.CC.1-2 of the Compact expressly deems mobile sports betting "to be exclusively conducted by the Tribe at the location of the servers that process such wagering activity on the Tribe's Indian lands," and that through the Compact, "[t]he Tribe will have statewide exclusivity for sports betting."[11]

---

[11] Compact Part III.CC.2; Letter from Bryan Newland, Principal Deputy Assistant Sec'y for Indian Affairs, U.S. Dep't of the Interior, to Marcellus W. Osceola, Jr., Chairman, Seminole Tribe of Fla. (Aug. 6, 2021), at 2, https://perma.cc/T4L7-SKAX (citing Compact Part XII.A.3(a)). The Compact also allows the Tribe to contract with "Qualified Pari-mutuel Permitholders" to

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 12 of 72

33. The Compact is the primary exception to Florida's general prohibition on gambling. The Florida law implementing the Compact (the "Implementing Law") specifically provides that "[g]ames and gaming activities authorized under [the Implementing Law] and conducted pursuant to [the Compact] … do not violate the laws of this state."[12]

34. Florida also maintains comprehensive statutory prohibitions on gambling. Specifically, chapter 849 of the Florida Statutes generally prohibits gambling within the State's borders while regulating the few entities authorized to offer gambling under Florida law.

35. Florida law prohibits betting on, aiding and abetting betting on, taking bets on, or holding bets on "the result of any trial or contest of skill, speed or power or endurance of human or beast[.]" § 849.14, Fla. Stat.

36. Most bookmaking is a "felony of the third degree." *Id.* § 849.25(2).

37. Florida law prohibits any person from maintaining "a gaming table or room, or gaming implements or apparatus, or house, booth, tent, shelter or other place for the purpose of gaming or gambling." *Id.* § 849.01.

38. The statute extends to those who hold, sell, transport, or manufacture "paraphernalia ordinarily or commonly used or designed to be used in the operation of gambling houses or establishments, excepting ordinary dice and playing cards." *Id.* § 849.231(1).

39. To give these prohibitions practical force, the statute specifies that all unlawful gambling contracts "are void and of no effect." *Id.* § 849.26.

---

provide "marketing or similar services" related to the Tribe's offering of online sports wagering at such permitholders' facilities. *See* Compact, Part III.CC.3; *id.* Part III.X (defining "Qualified Pari-mutuel Permitholders").

[12] § 285.710(13)(b)7, Fla. Stat.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 13 of 72

40. In reliance on the exclusivity guaranteed by the Compact—and in order to deliver the consumer protections the Compact requires—the Tribe has made substantial investments to develop, launch, and maintain Hard Rock Bet as its platform. This platform has been designed to ensure the consumer protections that Florida deemed essential to legal sports wagering.

41. DraftKings is no stranger to exclusivity arrangements. It has exclusivity agreements with the States of New Hampshire and Oregon, where it serves as the sole statewide mobile sportsbook provider.

**B. DraftKings' And Robins' Focus On Florida**

42. DraftKings was not a party to the Compact, and it holds no Florida sports betting license. But it has always been focused on breaking into the Florida market. In 2021, when the Tribe and the State entered into the Compact, DraftKings, at Robins' direction, pursued a ballot initiative and funded litigation challenging the Compact.

43. In June 2021, the month after the Florida Legislature ratified the Compact, DraftKings donated $10 million to "Florida Education Champions," a political committee that sponsored a ballot initiative that would have authorized operators other than the Tribe to offer online sports betting in Florida. By the campaign's end, DraftKings had contributed $22.7 million to the effort.[13] Robins professed that it was "our shared goal to have a safe, legal, regulated, and competitive market for online sports betting in the sunshine state."[14]

---

[13] Dara Kam, *No sports betting on Florida's 2022 ballot as petition-gathering effort fails*, Miami Herald (Apr. 26, 2022), https://perma.cc/W4JU-V6NQ.

[14] *DraftKings Inc. (DKNG) Q2 2021 Earnings Call Transcript*, *supra* note 3.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 14 of 72

44. To make that happen, DraftKings announced via Twitter that it would give all Florida customers $100 in free credit if the initiative reached its signature goal.[15]

45. The initiative failed. Florida Education Champions submitted only 472,927 valid signatures—far fewer than the approximately 891,589 required to place the measure on the ballot.[16]

46. While the ballot initiative was pending, DraftKings also funded litigation challenging the Compact.

47. In 2021, two small pari-mutuel facilities owned by a common family—West Flagler Associates, Ltd. ("West Flagler") and Bonita-Fort Myers Corporation—sued in the United States District Court for the District of Columbia to overturn the Department of the Interior's approval of the Compact.[17]

48. The district court ruled for the plaintiffs.[18]

49. As a result, the Tribe suspended its online sports betting operations for nearly two years while the case was on appeal. That suspension deprived the State of revenue for those two years.

50. The United States Court of Appeals for the D.C. Circuit reversed, after which the U.S. Supreme Court denied review.[19]

---

[15] Jill R. Dorson, *Florida Unhinged? Drama Surrounding Gaming Expansion Continues To Escalate*, SportsHandle (Jan. 21, 2022), https://perma.cc/964H-XWMY.

[16] Kam, *supra* note 13.

[17] In Florida, "pari-mutuel wagering is authorized for horse racing, harness horse racing, simulcast greyhound racing, jai alai games, and cardroom poker games." *Pari-Mutuel Wagering*, Florida Gaming Control Commission, https://perma.cc/CAN7-4ZFG.

[18] *W. Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260, 276 (D.D.C. 2021).

[19] *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1062 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2671 (2024).

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 15 of 72

51. DraftKings funded the West Flagler challengers' litigation.

52. After the West Flagler federal litigation concluded, DraftKings secretly funded another challenge. In *West Flagler Associates, Ltd. v. DeSantis*, 382 So. 3d 1284 (Fla. 2024), petitioners whose litigation was secretly funded by DraftKings sought to invalidate the mobile sports betting provisions of the Compact before the Florida Supreme Court.

53. The Florida Supreme Court denied the petition.

54. Then in 2025, DraftKings secretly formed an anonymous Delaware LLC called "Protect the Constitution" to file suit in Leon County Circuit Court, challenging the constitutionality of the Compact's Implementing Law.

55. On October 31, 2025, the court dismissed the lawsuit for lack of standing, finding that the complaint lacked sufficient information about the organization's secret members, activities, and business operations, but granted the plaintiff leave to amend.[20]

56. DraftKings has recently revealed that it was secretly funding the *Protect the Constitution* litigation as well.

57. On September 17, 2026, Protect the Constitution LLC and DraftKings filed a First Amended Complaint that confirms that DraftKings is now the sole member of the Protect the Constitution LLC and formally joins the case as a plaintiff.[21]

58. In all these suits, the Tribe and State have successfully defended the carefully negotiated Compact and Implementing Law.

---

[20] *Protect the Constitution LLC v. Fla. Gaming Control Comm'n*, Case No. 2025CA00718, Seq. No. 28 (Fla. 2d Cir. Ct. Leon Cnty. Oct. 31, 2025).

[21] *Protect the Constitution LLC v. State of Florida*, First Am. Compl. ¶¶ 7-8, Case No. 2025CA00718 (Fla. 2d Cir. Ct. Leon Cnty. filed Sept. 17, 2026) (hereinafter "PTC Am. Compl.").

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 16 of 72

**C. DraftKings' Illegal Operations: Pick6 And The Super App Sportsbook**

59. When its political challenges to Florida law and the Compact failed, DraftKings decided—at Robins' direction—to simply flout Florida law. Today, DraftKings is shamelessly offering illegal sports betting products and pitching them directly to Florida consumers. Except where otherwise noted, all allegations in this Complaint referring to DraftKings' conduct were undertaken at Robins' express direction.

60. The two products described in this section—Pick6 (launched in January 2026) and the Super App sportsbook (launched in June 2026)—share three defining features. First, each violates Florida law and the Compact. Second, each is offered without regard to Florida's regulatory scheme designed to protect vulnerable consumers. Third, each induces Florida consumers—including Floridians as young as eighteen—to violate Florida law.

***1. Pick6***

61. In January 2026, DraftKings launched Pick6 in Florida. This gambling product offers player proposition bets that are indistinguishable from the online sports betting the Compact reserves exclusively to the Tribe. DraftKings has long offered Pick6 in States where it holds a license to operate a sportsbook.

62. Pick6 allows users to predict whether individual athletes will perform "more" or "less" than statistical projections set by DraftKings, and to string those predictions together into parlays of up to six selections.

63. Pick6 contests offered in Florida cover professional sporting events, including but not limited to those of the NFL, NBA, NHL, MLB, MLS, UFC, WNBA, and NASCAR, as well as the FIFA World Cup and certain esports competitions.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 17 of 72

64. As the below image shows, DraftKings misleadingly represents to Florida consumers, on its website and in its advertising, that Pick6 is a legal product in Florida.[22] Upon Pick6's launch in Florida, for example, DraftKings offered new users in Florida $50 in "bonus picks" after a $5 bet.[23]




[22] *Where Can You Play DraftKings Pick6?*, DraftKings Pick6, https://perma.cc/H96N-LS8B.

[23] Daniel Lewis, *DraftKings Pick6 now live in Florida: New users get $50 in credits after a paid $5 entry*, CBS Sports (Jan. 16, 2026), https://perma.cc/SQX8-2TYE.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 18 of 72

65. DraftKings has continued to advertise this offering to "Play $5" and "Get $50" instantly "in Bonus Picks" as recently as last month. Plaintiff observed the following advertisement on Instagram on September 3, 2026:




66. Based on DraftKings' representations, Florida consumers may predictably but incorrectly conclude that Pick6 is a legal product in Florida. It is not. Pick6 is illegal "gambling" under Florida law.[24] DraftKings operates Pick6 without a license, without state oversight, and without any consumer protections Florida requires as a condition of legal sports wagering.

[24] *See* §§ 849.01 *et seq.*, Fla. Stat.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 19 of 72

67. Pick6 constitutes illegal sports wagering, plain and simple, no matter how DraftKings labels it or dresses it up.

68. The Compact specifically defines "sports betting" to include wagers on "individual performance statistics of an athlete," which encompasses most professional player prop bets subject to the Tribe's exclusive rights.[25]

69. Florida law makes it a third-degree felony to "receive[] in any manner whatsoever any money or other thing of value staked, bet, or wagered … by or for any other person upon any such result."[26] Pick6 operates in exactly this manner: users pay entry fees to predict the performance of athletes, and winners receive payouts funded directly by the stakes of losing participants.

70. Pick6 is functionally identical to the "player prop bets" offered by every regulated sportsbook in the country, including the Tribe's legally operated "Hard Rock Bet" business (which is subject to the Compact), and DraftKings' own sportsbooks in other States.

71. The following images demonstrate that Pick6 is indistinguishable from traditional house-banked sports betting, and that DraftKings is offering the exact same activity that Florida regulates through the Compact. Pick6, depicted on the left, offers the same bets that the Tribe's Hard Rock Bet offers through "Player Props," depicted on the right.

---

[25] Compact Part III.CC.

[26] § 849.14, Fla. Stat.; *see also id.* §§ 849.01; 849.25; 849.26; 849.231(1).

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 20 of 72







**Pick6** **Hard Rock Bet**

72. When a Pick6 user places a bet using two picks, that essentially replicates a 2-Bet Parlay that can be made on the Tribe's Hard Rock Bet. Compare Pick6, depicted on the left, with Hard Rock Bet, depicted on the right.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 21 of 72




**Pick6**




**Hard Rock Bet**

73. Pick6 also allows for prop bets on *collegiate* sports, which is not permissible under the Compact or Florida law.[27]

[27] Compact Part III.L, III.CC.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 22 of 72

74. DraftKings' answer to all of this is to describe Pick6 as a "peer-to-peer" fantasy sports variant in which participants compete against one another for shared prize pools, rather than wagering directly against the house.[28] That characterization attempts to distinguish Pick6 from house-banked sports betting, and on that basis evade Florida gambling laws and the Tribe's exclusive rights under the Compact. But the characterization is false. In fact, DraftKings guarantees payouts for winning bets and guarantees prize pools regardless of whether the contests fill.[29] DraftKings, in other words, is the house.

75. Regardless, that characterization is also a non sequitur: even if true, it would not exempt the activity from § 849.14's broad prohibition on betting on the results of contests of human skill, speed, power, or endurance. In 1991, Florida Attorney General Robert A. Butterworth issued an advisory legal opinion confirming that § 849.14 prohibits pay-to-play fantasy sports contests.[30] This opinion explains that "[s]ection 849.14, F.S., prohibits the operation of and participation in a fantasy sports league whereby contestants pay an entry fee for the opportunity to select actual professional sports players to make up a fantasy team whose actual performance statistics result in cash payments from the contestants' entry fees to the contestant with the best fantasy team." This opinion has never been withdrawn or superseded. Notably, while the Compact contains an exception that would permit third parties to operate fantasy sports contests if the State were to legalize them, the State has never legalized fantasy sports.[31]

---

[28] DK Network Editors, *DraftKings Pick6: What States You Can Play*, DraftKings Network (May 27, 2025), https://perma.cc/U7D5-MWN5.

[29] Nate Weitzer, *DraftKings Pick6 Guide: Everything You Need To Know*, Legal Sports Report (last updated Sept. 3, 2026), https://perma.cc/Q8L9-XNWM.

[30] Op. Att'y Gen. Fla. 91-3, 1991 WL 528146 (1991).

[31] *See* Compact Part III.F.3-6, L, CC, FF; Part XII.B.9.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 23 of 72

76. DraftKings' own sworn pleadings in the *Protect the Constitution* litigation admit that its daily fantasy sports offerings are akin to sports betting. DraftKings alleges that "[d]aily fantasy sports contests and online sports betting are competing offerings in the commercial arena for online sports entertainment dollars," and that when "the Seminole Tribe began offering sports betting throughout the State, DraftKings … suffered a decline in revenue from [its] daily fantasy sports contests offered in Florida" because consumers "switched some or all of their online sports entertainment spending from daily fantasy sports contests to sports betting."[32]

***2. DraftKings Super App Sportsbook***

77. DraftKings' launch of Pick6 did not occur in isolation. In June 2026, at Robins' direction, DraftKings launched "DraftKings Sports & Casino," an application that allows Floridians to place sports wagers via a "Sports" tab in the application. DraftKings calls this its "Super App," and advertises it to Florida consumers.[33] But it is nothing more than a one-stop shop for illegal gambling.

78. Through a single home screen, a Florida user can toggle between tabs labeled "Sports," "Predictions," "Horse," "Free Games," and "Pick 'Em" (i.e., Pick6). Selecting "Sports" presents the user with a sportsbook featuring conventional betting markets—game lines, moneylines, point spreads, over/unders, a wide selection of player props, and parlays—on professional and collegiate athletic contests, displayed in the same format used by every traditional, regulated sportsbook (including the DraftKings Sportsbook that DraftKings itself operates in licensed States and the Tribe's Hard Rock Bet).

---

[32] PTC Am. Compl. ¶ 12.

[33] DK Network Editors, *DraftKings is now available in all 50 states**, DraftKings Network (June 17, 2026), https://perma.cc/EK2W-ET2G; *DraftKings Outlines Expanded Growth Strategy and Unveils Plans to Launch Super App, "DraftKings Sports & Casino"*, DraftKings Investor Relations (Mar. 2, 2026), https://perma.cc/J3PZ-R3PF.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 24 of 72

79. The images below depict the Super App home screen as presented to a Florida user, with the "Sports" tab selected and live moneyline markets displayed on past World Cup matches.







80. The Super App sportsbook also permits the Florida user to combine multiple sports wagers into a single parlay, displayed in a "Trade Slip" that calculates combined odds and potential payout exactly as a sportsbook bet slip does. Parlays "wrap multiple bets into one and are especially profitable for DraftKings because they tend to favor the sportsbook."[34]

---

[34] Katherine Hamilton, *DraftKings Is Using Its Sports-Betting Playbook to Win Prediction Markets Race*, Wall Street Journal (Mar. 3, 2026), https://tinyurl.com/7e3tjyc7.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 25 of 72

81. In the image below, a Florida user has built a two-leg parlay on World Cup matches in the Super App sportsbook, reflected as a "+900 Combo" on which "$10 pays $90."



Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 26 of 72

82. Tellingly, DraftKings' Florida Super App sportsbook looks and operates almost identically to its sportsbook in New Jersey, a State in which DraftKings operates pursuant to a valid sports betting license. In the images below, a Florida user placing a sports wager would see the sportsbook depicted on the left, while a New Jersey user placing a wager on DraftKings' legal sportsbook would see the almost identical interface depicted on the right.




Florida




New Jersey

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 27 of 72

83. The Super App sportsbook also offers player proposition bets. A Florida user is able to place "Pick 'Em" bets as seen on the left; a DraftKings user in New Jersey is able to place a similar bet, depicted on the right.




Florida




New Jersey

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 28 of 72

84. That is no accident. DraftKings does not draw any distinction between its licensed and illicit sportsbook offerings. To the contrary, DraftKings advertises that it offers one sports betting product—the Super App sportsbook—which is "now live in all 50 States," including Florida.[35]







[35] *DraftKings is now available in all 50 states**, *supra* note 33.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 29 of 72




85. DraftKings has blasted the same message across the social-media feeds of Florida users. The advertisements below were served to Florida users in August 2026 on TikTok and Instagram by DraftKings and celebrities like Dave Portnoy, who noted that he was speaking on behalf of "his partners" at DraftKings. Each announces that DraftKings Sports is "NOW LIVE IN FLORIDA" and offers new Florida customers $150 to "$200 in Bonuses" in exchange for a $5 wager. The TikTok advertisement pairs that offer with the DraftKings Sports mark and the words "COLLEGE FOOTBALL," soliciting Florida consumers to wager on collegiate athletic contests. This ad has been running continuously for weeks.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 30 of 72






Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 31 of 72









Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 32 of 72

86. DraftKings even recently pegged its advertising to the 2026 World Cup, advertising that Floridians could bet using "DraftKings Sports" on the World Cup and that fans in Florida "can get in on every match":







87. DraftKings has also begun advertising on billboards, including in Broward County, that its sportsbook is available in Florida:

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 33 of 72








Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 34 of 72

88. DraftKings delivered a similar advertisement through famous Florida resident Dave Portnoy, via Barstool Sports: DraftKings is available in all 50 States and it "doesn't matter where you reside."[36]




[36] Barstool Sports (@barstoolsports), *DraftKings Sports now live in 50 states! New DraftKings customers can spend $5, get $200 in total bonuses! Check it out*, X (June 4, 2026), https://perma.cc/4EQN-777E.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 35 of 72

89. DraftKings may offer two defenses for its actions, neither of which withstands scrutiny. First, DraftKings may claim that it can offer this sportsbook in Florida without approval from the State because it routes Florida "Sports" tab wagers through a purported "predictions market" run by Defendant DraftKings Predictions. But that is a distinction without a difference, for the reasons set forth in § C.3 below. The "Sports" tab powered by predictions on the back end "is indistinguishable from [the] Sportsbook" interface in DraftKings' legal offerings in other States.[37]

90. The above advertisements also show DraftKings speaking out of both sides of its mouth—with one message calculated (by salespeople) to entice consumers and the other crafted (by lawyers) to paper over the legal exposure. The headline sells sports betting: "DRAFTKINGS SPORTS," "COLLEGE FOOTBALL," "NOW LIVE IN FLORIDA!" The fine print, in type a fraction of the size, recharacterizes the identical product as "[e]vent [c]ontract [t]rading … offered by DraftKings Predictions, a CFTC-registered Futures Commission Merchant and NFA member." Of course, no Florida consumer who responds to the headline understands himself to be opening a futures account.

91. Second, DraftKings may point to a change in how it displays prices. On August 28, 2026, DraftKings changed the way the Super App displays prices to Florida users, replacing American odds with so-called decimal odds, which represent how many cents a bet costs to achieve a payoff of $1. Until that date—from the Super App's launch in Florida in June 2026 through August 28, 2026—every Florida user who placed a sports wager on the Super App saw the price displayed in the same format used by licensed sportsbooks throughout the country, including the

---

[37] Justin Balthrop (@PhdDfs), X (July 18, 2026), https://perma.cc/WH5X-7LPK.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 36 of 72

Tribe's Hard Rock Bet. The screenshots reproduced above depict the Super App as DraftKings presented it to Florida consumers throughout that period.

92. The recent change is purely cosmetic. DraftKings did not change what it sells, to whom it sells it, who takes the other side of the wager, or whether it holds a Florida license. A Florida user still selects a team or a player, still stakes money on the outcome of an athletic contest, still strings selections together into parlays, and still wins or loses on the result of the game. DraftKings changed the label on the price. It did not change the price, the product, or the transaction.

93. DraftKings itself confesses as much. In an article titled "Understanding Odds," published in the "Sports Betting Basics" section of DraftKings' own customer help center, DraftKings instructs its customers that "[h]ere at DraftKings, there are three betting odds formats"—American, decimal, and fractional—and that odds of "10/11 … are the same," just "different odds formats." DraftKings treats the choice among them as nothing more than a user preference: a customer "can change [his] odds type at any time by using the odds selector in Settings under 'My Account.'" And DraftKings confirms that "displaying odds in the American format is the default setting for DraftKings Sports betting."[38]

94. The Super App sportsbook therefore facilitates wagering on contests of skill or endurance of a human and constitutes bookmaking in violation of Florida law.[39] Through the Super App sportsbook, DraftKings operates a game, game machine, or gaming apparatus in violation of Florida law.[40]

---

[38] *Understanding Odds*, DraftKings Help Center, Sportsbook › Sports Betting Basics, https://perma.cc/XK4D-WHVH.

[39] *See* §§ 849.14, 849.25, Fla. Stat.

[40] *See id.* §§ 849.01, 849.231(1), 849.14, 849.25, 849.26.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 37 of 72

### ***3. The Super App Sportsbook Is Not A "Prediction Market"—It Is A Sportsbook***

95. A "prediction market" is a financial exchange on which participants buy and sell contracts that bear on the value, price, or yield of currencies, financial instruments, or commodities. Prediction markets have existed for decades as instruments for hedging commodity and financial risk—tools for institutional participants to manage exposure to price movements, economic indicators, and other measurable future outcomes. In that traditional form, prediction markets served a legitimate informational function.

96. DraftKings Predictions is not such a market. It is gambling and exists solely for entertainment purposes. There is no distinction—visual, functional, or experiential—between a sports bet powered by DraftKings Predictions in the Super App sportsbook and a wager placed on the Super App sportsbook in a State where DraftKings is licensed to operate. To the Florida user, the Super App sportsbook operates exactly as a sportsbook operates. That DraftKings Predictions may run in the background does not transform sports wagers into "commodities trading." DraftKings' own executives have admitted as much. As Robins stated on DraftKings' Q4 2025 earnings call, "[m]ost customers do not really even understand the difference [between DraftKings Predictions and Sportsbook] … in essence, it is the same general message to the customer."[41] DraftKings also uses the same AI and machine-learning systems it uses for sportsbook probabilities to "power [DraftKings] Predictions" and its Super App sportsbook.[42]

97. The Super App sportsbook also differs from a genuine prediction market in at least five other fundamental respects.

---

[41] *DraftKings (DKNG) Q4 2025 Earnings Call Transcript*, *supra* note 2.

[42] Mike Breen, *DraftKings Unveils 'Super App' Plans to Capture $10B Prediction Market Opportunity*, DeFiRate (Mar. 2, 2026), https://perma.cc/SH59-D6FR.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 38 of 72

98. ***First***, unlike genuine prediction markets, DraftKings is a licensed sportsbook operator in approximately 27 States and Washington, D.C., and operates as part of a single integrated business—using its established brand and infrastructure to funnel users into its illegal Florida operations under the guise of an approved financial product.[43] Indeed, in its Q1 2026 earnings presentation, DraftKings acknowledged that DraftKings Predictions and its traditional sportsbook "serve the same customers."[44] Likewise, in its accompanying letter to investors, DraftKings announced that going forward it would report "Sports revenue" as one number, combining both "Sportsbook and Sports Predictions," which "best reflects how we plan to operate the business."[45] Genuine prediction markets have never offered a product like Pick6, and do not report Sportsbook and Sports Predictions revenue as one number.

99. ***Second***, DraftKings' prediction-market competitors have argued (albeit incorrectly, as interpreted by the courts) that the federal "impartial-access requirement" mandates that the market be offered as a "single nationwide market."[46] By contrast, DraftKings' Super App sportsbook is powered by DraftKings Predictions only in States where it lacks a sports betting license, such that it is not offered as a single nationwide market. Indeed, Robins has explained that DraftKings specifically intends for its putative prediction offering to operate in "states that don't have legal online sports betting," because launching DraftKings Predictions in States where

---

[43] *DraftKings Inc. (DKNG) Q1 FY2026 earnings call transcript, supra* note 2.

[44] *DraftKings Q1 2026 Earnings Presentation*, May 7, 2026, at 3, https://perma.cc/J4EC-M8DU.

[45] *First Quarter 2026 Business Update*, *supra* note 1, at 2.

[46] Opening Brief of KalshiEX, LLC at 37, *KalshiEX, LLC v. Hendrick*, No. 25-7516 (9th Cir. Dec. 26, 2025), Dkt. No. 20.1. *But see KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *16 (9th Cir. Aug. 28, 2026) (rejecting Kalshi's "impartial access" argument).

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 39 of 72

DraftKings "already ha[s] online sports betting" would "upset regulators that we have great relationships with[.]"[47]

100. ***Third***, genuine prediction markets offer a wide variety of contracts on traditional hedging subjects (like weather, energy, agriculture, and financial predictions). DraftKings' Super App offers a sportsbook in a separate interface, and segregates other "Predictions" contracts from "Sports." DraftKings does so in a deliberate attempt to cause consumers to believe that the items under the "Sports" tab are not prediction markets contracts.

101. ***Fourth***, prediction markets claim that they facilitate the buying and selling of contracts between participants, rather than betting against customers like a sportsbook, and "[p]rediction markets earn revenue through transaction fees rather than by taking the other side of trades."[48] By contrast, DraftKings has all but admitted it takes direct stakes in wagers. Jeanine Hightower-Sellitto, Senior Vice President and General Manager of DraftKings Predictions, has stated that DraftKings has launched "a dedicated market making division" that trades against consumers.[49] That distinguishes DraftKings from genuine prediction markets, which merely supervise the market in a neutral capacity. Meanwhile, DraftKings has promised investors that the Super App sportsbook will carry "structurally higher margins than its traditional sportsbook"—up to 10 to 30 percentage points higher.[50] Upon information and belief, even accounting for its avoidance of state taxes, the only way DraftKings can achieve structurally higher margins than a traditional sportsbook is by operating the Super App as a traditional sportsbook—that is, by taking

---

[47] Edelstein, *supra* note 6.

[48] Sara-Jayne Slack, *What Are Prediction Markets? A Guide for Investors*, Investing.com (June 23, 2026), https://perma.cc/FN4X-PHAH.

[49] Dustin Gouker, *The Early Line: DraftKings Is Moving To A 'Super App' That Includes Prediction Markets*, The Closing Line (Mar. 2, 2026), https://perma.cc/37FB-2GH8.

[50] Breen, *supra* note 42.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 40 of 72

direct exposure to the opposite sides of customer wagers—even as it charges transaction fees through DraftKings Predictions on the back end. Robins has admitted as much, boasting that DraftKings owns "3 key layers of the Predictions stack in-house: the brokerage, the exchange, and the market maker," making DraftKings "the only operator that has all 3 up and running today."[51]

102. ***Fifth***, DraftKings tells Florida consumers, in its own advertising, that it is indeed offering gambling. The DraftKings Sports advertisements DraftKings has directed at Floridians carry the problem-gambling warning that accompanies licensed sportsbook advertising: "GAMBLING PROBLEM? CALL 1-800-GAMBLER."

103. Stills from a video advertisement served to Florida users in August 2026, reproduced below, are illustrative. The advertisement depicts a car driving past highway signs for Georgia, Texas, California, New York, and Florida, and ends at a sign reading "DRAFTKINGS IS LIVE IN ALL 50 STATES." The 1-800-GAMBLER warning runs across the bottom of the frame for the length of the advertisement.

---

[51] *DraftKings (DKNG) Q2 2026 Earnings Call Transcript*, Motley Fool (Aug. 13, 2026), https://perma.cc/X5TF-XJVB.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 41 of 72




104. No financial product is advertised this way. A lawful commodity futures contract, exchange-traded fund, option, or brokerage account is sold with disclosures about the risk of losing money. None is sold with the telephone number of a compulsive-gambling helpline. DraftKings appends "1-800-GAMBLER" to its Florida advertising for the same reason it appends the same warning to its licensed sportsbook advertising in the States where it holds a license: DraftKings knows that what it is offering Floridians is sports betting. The warning is DraftKings' own admission, printed on its own advertisements, that the Super App sportsbook is a gambling product and not a financial market.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 42 of 72

105. The same fine print confirms that DraftKings knows which of its products is a licensed sportsbook and which is not—and that it applies the weaker protections to the unlicensed one. DraftKings' advertising states that its "Sportsbook" is offered to persons "21+" in most States, while "Predictions"—the product that powers the Florida Super App sportsbook—is offered to persons "18+."

### D. DraftKings' Illegal Products Are Operated Without Regard To The Consumer Protections Florida Requires For Legal Sports Betting

106. DraftKings maintains that Pick6 and the Super App sportsbook are not subject to sports betting laws, including the consumer protections that Florida deemed essential before authorizing sports betting. By doing so, DraftKings flouts the considered decision Florida has made to legalize and regulate sports betting through its Compact with the Tribe rather than with DraftKings, and directly infringes upon the Tribe's exclusive authority to offer sports betting in Florida.

107. A Florida resident who wagers with DraftKings instead of Hard Rock Bet loses every protection the Compact and Florida law guarantee. Not only is DraftKings alert to this gap, but it has exploited it to drive growth. In a letter to investors in DraftKings' Q1 2026 earnings report, Robins acknowledged that DraftKings' Super App sportsbook "customers are experiencing losses more quickly than [traditional] Sportsbook customers."[52] No doubt that is due to Defendants' marketing to teenagers and operating outside Florida's regulatory scheme. Robins then bragged that the Super App sportsbook's operations in States where DraftKings lacks a sports

[52] *First Quarter 2026 Business Update*, *supra* note 1, at 3.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 43 of 72

betting license have proven to be "one of [DraftKings'] fastest to profitability business lines … ever launched."[53]

108. The consequences extend beyond individual consumers. Every dollar wagered illegally through DraftKings in Florida is a dollar diverted from the regulated system that Florida and the Tribe deliberately created. DraftKings collects money from Florida consumers for its own private benefit, disclaims all legal responsibility to those consumers, and returns nothing to the State or the Floridians it exploits.

109. Tax avoidance is a central component of DraftKings' Illegal Sports Gambling Offerings. DraftKings boasts that a primary goal of its Super App sportsbook is to avoid state taxes: "Because prediction markets aren't subject to state taxes, they are expected to have margins that are 10 to 30 percentage points higher than traditional sports betting."[54] Robins said in a separate CNBC interview that tax avoidance is the "main thing" behind those inflated profit margins.[55]

110. In the fine print, DraftKings concedes what it denies in public: that its operations may violate state law. And it attempts to offload the resulting legal exposure onto Florida consumers.

111. The Pick6 Terms of Use contain an alarming and sweeping disclaimer to bettors: DraftKings "DO[ES] NOT WARRANT THAT YOUR PARTICIPATION IN CONTESTS OR ACTIVITIES OR USE OF THE DRAFTKINGS PLATFORM OR SERVICES IS LAWFUL IN

---

[53] *DraftKings Inc. (DKNG) Q1 FY2026 earnings call transcript*, *supra* note 2, at 23:04 (emphasis added).

[54] Hamilton, *supra* note 34.

[55] *DraftKings CEO on launch of new 'super app,' prediction markets and more*, *supra* note 9, at 01:41-43.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 44 of 72

ANY PARTICULAR JURISDICTION, AND, IN ANY EVENT, [DRAFTKINGS] SPECIFICALLY DISCLAIM[S] SUCH WARRANTIES."[56]

112. The Super App sportsbook's Terms of Use do the same, through a sweeping disclaimer: "[DRAFTKINGS] DO[ES] NOT WARRANT THAT YOUR CREATION OF YOUR DRAFTKINGS PREDICTIONS ACCOUNT, YOUR USE OF THE SERVICES, OR ANY COMMODITY TRANSACTION IS LAWFUL IN ANY PARTICULAR JURISDICTION, AND, IN ANY EVENT, [DRAFTKINGS] SPECIFICALLY DISCLAIM[S] SUCH WARRANTIES."[57]

113. The same Terms of Use require users to "REPRESENT AND WARRANT THAT [THEIR] ACTIVITIES ARE LAWFUL IN EVERY JURISDICTION" where they use the service, despite DraftKings refusing to warrant the same.[58]

114. DraftKings goes further: it requires users to "RELEASE AND HOLD HARMLESS THE DRAFTKINGS RELEASED PARTIES FROM ANY AND ALL LIABILITY" and to "WAIVE ALL DISPUTES, CAUSES OF ACTION, CONTROVERSIES, AND CLAIMS" arising from the possibility that using DraftKings Predictions "VIOLAT[ES] APPLICABLE LAW."[59]

115. A separate provision titled "WAIVER OF DAMAGES AND CONSEQUENTIAL DAMAGES" reinforces this point, requiring users to acknowledge that "NEITHER DRAFTKINGS PREDICTIONS NOR THE DRAFTKINGS RELEASED PARTIES ARE RESPONSIBLE FOR YOUR COMPLIANCE WITH APPLICABLE LAW" and again

---

[56] DraftKings Pick6 Terms of Use (June 30, 2026), https://perma.cc/L5YV-XZCX.

[57] DraftKings Predictions Terms of Use (Aug. 4, 2026), https://perma.cc/25X8-8C8H.

[58] *Id.*

[59] *Id.*

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 45 of 72

demanding that users waive all claims "ARISING OUT OF[] YOUR COMPLIANCE OR NON-COMPLIANCE WITH APPLICABLE LAW[.]"[60]

116. DraftKings Predictions also reserves the right to "delay or refuse to allow you access to, or use of, the Services or may delay or refuse any Commodity Transactions" if DraftKings determines "that execution or attempted execution of any Commodity Transactions by you might contravene Applicable Law."[61] This provision confirms that DraftKings knows its product violates state law. Yet DraftKings pushes the product—accepting bets from Florida consumers unless and until it may suddenly decide the legal risks have exceeded its appetite.

117. Under Florida law, placing a sports bet through Pick6 or the Super App sportsbook (via DraftKings Predictions) is a criminal act—a third-degree felony under § 849.14, Florida Statutes, punishable by a fine and up to five years' imprisonment.

118. A user who suffers harm—whether because a platform shuts down, a position is frozen, or winnings are withheld—has no legal recourse, because the underlying contracts are void and of no effect under Florida law.

119. Knowing this, DraftKings has quietly required its customers to waive any claim arising from that illegality, while publicly advertising the product as a legitimate way to bet on sports.

120. In short, DraftKings has structured its Terms of Use so that it keeps its customers' money whether it wins or loses in court, leaving Florida customers to bear all of the adverse legal consequences, along with the tab. DraftKings has thus made an eyes-wide-open decision to profit

[60] *Id.*

[61] *Id.*

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 46 of 72

from illicit operations while exposing Florida consumers to the precise risks the State has deemed unacceptable.

121. DraftKings has faced widespread criticism for allowing bettors under twenty-one to place millions of dollars in bets.[62] These are precisely the harms Florida and the Tribe designed the Compact to prevent. The Compact set the minimum sports betting age at twenty-one, required rigorous age-verification protocols, and mandated robust problem-gambling resources.

122. It is no surprise that DraftKings is especially popular with Floridians under twenty-one. They cannot bet on Hard Rock Bet, leaving DraftKings as the only game in town for them.

123. DraftKings has exploited this demographic, blanketing Florida with deceptive advertisements that would appeal to the young, encouraging residents to "trade sports like it's Wall Street" and be entered to win a $1 million lottery—an offer that may violate Florida's lottery laws.[63]

[62] *See* Nick Penzenstadler & Carlie Procell, *Teens are betting millions on sports apps — and almost no one is punished*, USA Today (Feb. 3, 2026), https://perma.cc/8BVQ-B5PC.

[63] *DraftKings Debuts Predictions App, Entering Prediction Markets*, DraftKingsNews (Dec. 19, 2025), https://perma.cc/SMM6-BARA; *see* §§ 849.09-.10, Fla. Stat.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 47 of 72







**E. The Two DraftKings Enterprises And Robins' Conduct Of Their Affairs**

124. Robins conducts and participates in the affairs of two separate RICO enterprises: DraftKings, Inc. (the "DraftKings Enterprise"), and its wholly owned subsidiary GUS III LLC d/b/a DraftKings Predictions (the "Predictions Enterprise") (together, the "Enterprises"). Robins conducts the affairs of each Enterprise through a pattern of racketeering activity, offering illegal gambling to Florida residents through Pick6 and the Super App sportsbook.

125. Each Enterprise is an "enterprise" within the meaning of the Florida RICO Act standing alone. The DraftKings Enterprise is a corporation and the Predictions Enterprise is a limited liability company; each is therefore a "corporation … or other legal entity" under § 895.02(5), Florida Statutes. Neither Enterprise's status as an enterprise depends on its association with the other.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 48 of 72

126. In the alternative, and only if the Court concludes that the two Enterprises must be treated as a single unit, the Tribe alleges that DraftKings and DraftKings Predictions together constitute one enterprise associated in fact within the meaning of § 895.02(5), Florida Statutes, which has associated for the common purpose of profiting from sports wagering in Florida.

127. Each wager offered or accepted through Pick6 or through the Super App's Sports tab constitutes a predicate act of racketeering under Florida's RICO laws, §§ 895.01 *et seq.*, Fla. Stat.

128. Robins is a natural person, separate and distinct from each of the Enterprises. The DraftKings Enterprise has an existence and a purpose wholly apart from the racketeering activity alleged here: DraftKings is a publicly traded corporation with a board of directors, thousands of employees, a dispersed base of public stockholders, nearly $6.1 billion in fiscal year 2025 revenue, and lawful, licensed sportsbook operations in approximately 27 States and Washington, D.C. Robins does not own the DraftKings Enterprise; he directs it. Through a dual-class share structure, Robins controls over 88% of DraftKings' total voting power while holding a far smaller share of its equity. That structure gives him effective unilateral control over every major business decision the company makes, even though the company's assets, revenues, contracts, and legal obligations remain its own and not his. Robins has used that control to direct both Enterprises' affairs into a pattern of racketeering activity in Florida, personally directing and approving the decision to launch Pick6 without a license; the decision to launch DraftKings Predictions in December 2025; the decision to launch the Super App sportsbook in Florida in June 2026; and the decision to violate the Compact and Florida law.

129. Robins is likewise a person distinct from the Predictions Enterprise, which has a legal existence and a regulatory identity of its own. GUS III LLC is a limited liability company

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 49 of 72

with its own place of business at 222 Berkeley Street, 5th Floor, Boston, Massachusetts; and it does business under names of its own, "DraftKings Predictions" and "DraftKings Sports."[64]

130. DraftKings' own public filings establish Robins' control of the DraftKings Enterprise. In its annual report for the fiscal year ended December 31, 2025, DraftKings disclosed that Robins "holds all of the issued and outstanding shares of [DraftKings'] Class B common stock," that each share of Class B common stock carries ten votes while each share of Class A common stock carries one, and that Robins accordingly "holds approximately 89% of the voting power of [DraftKings'] capital stock and will be able to control matters submitted to [DraftKings'] stockholders for approval, including the election of directors, amendments of [its] organizational documents and any merger, consolidation, sale of all or substantially all of [its] assets or other major corporate transactions."[65]

131. Because Robins "controls a majority of the voting power of [DraftKings'] outstanding capital stock," DraftKings operates as a "controlled company" under the listing standards of The Nasdaq Stock Market. As DraftKings discloses, that status exempts it from the requirements that would otherwise obligate it to maintain a majority of independent directors, a nominating committee composed solely of independent directors, and executive compensation determined by a majority of the independent directors or by a compensation committee composed solely of independent directors. Robins therefore controls not only the outcome of stockholder votes but also the composition and independence of the board of directors to which he nominally reports, and the compensation of the executives who report to him.

[64] *BASIC Profile for GUS III LLC, NFA ID 0571907*, Nat'l Futures Ass'n, https://perma.cc/WR8Z-5ACX.

[65] *Annual Report (Form 10-K)*, DraftKings Inc. (Feb. 13, 2026) at 41, https://tinyurl.com/43mej5yv.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 50 of 72

132. DraftKings is accordingly a "company whose public shareholders supply almost all of the capital and bear almost all of the risk, while one person decides the outcome of every shareholder vote."[66]

133. As an example of Robins' control, DraftKings' 2026 Schedule 14A specifies that votes for the election of the company's eleven director nominees, for the choice of the company's auditor, and for executive compensation are assured "notwithstanding a contrary vote by any or all shareholders other than Mr. Robins." The structure and practice of the DraftKings board demonstrate that Robins maintains control. DraftKings does "not currently have a lead independent director" and the nominating and corporate governance committee held no meetings over the past year.[67]

134. DraftKings also discloses to its investors that Robins' interests are not the corporation's interests and are not its stockholders' interests. DraftKings warns that Robins "may have interests that differ from yours and may vote in a way with which you disagree, and which may be adverse to your interests."[68] By DraftKings' own account, then, Robins and DraftKings are distinct persons whose interests may diverge and conflict.

135. DraftKings Predictions, in turn, is a single-member LLC wholly owned by DraftKings. By virtue of his sole control over DraftKings, Robins has sole control over DraftKings Predictions and controls and conducts the affairs of both Enterprises. The National Futures Association's ("NFA") public record for GUS III LLC also lists Robins among the entity's "Listed Principals," states his title as "Indirect Owner," and reports that he holds a "10% or More Financial

---

[66] *Who owns DraftKings? Ownership structure explained (2026)*, Revenue Memo (Aug. 6, 2026), https://perma.cc/6C3F-CTFL.

[67] DraftKings Schedule 14A (Mar. 26, 2026), at 4, 7-9, 14, 16, https://tinyurl.com/3tjjvfvf.

[68] *Annual Report (Form 10-K)*, *supra* note 65, at 41.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 51 of 72

Interest" in it. The NFA explains that listed principals are "[d]etermined by their ability to control a registrant's business activities, their formal title or position with the registrant, or their ownership or financial stake in a registrant."[69]

136. Robins' direction of both Enterprises' affairs is documented in his own recorded statements.

137. DraftKings' effort to launch its Super App sportsbook traces back to December 2025, when, at Robins' direction, it launched its illegal sportsbook in Florida by a different name and in a separate application, called "DraftKings Predictions." DraftKings made the sports-related components of DraftKings Predictions available only in States, including Florida, where it did not hold a sports betting license. The express purpose, according to Robins, was to coerce "more states to legalize online sports betting."[70] When it released DraftKings Predictions, DraftKings named "Florida" among the "key markets" it was targeting.[71]

138. Robins described this strategy publicly months before DraftKings launched DraftKings Predictions. At the Bank of America Securities Gaming & Lodging Conference in September 2025, Robins stated: "I think the [prediction market] opportunity is likely to be very significant in states that do not have legal online sports betting. And I think it is likely to be fairly small in states that do have online sports betting." Robins elaborated: "[N]o doubt, there will be in a state that doesn't have an online sports book available, at least [a] legal one, there will be people that just want to go and do game lines and other simpler stuff that's available on it. So that's kind of like the way I look at it. I think where you have both, it's clearly in my mind going

---

[69] *BASIC Profile for GUS III LLC*, *supra* note 64.

[70] *Third Quarter 2025 Business Update*, DraftKings, at 3, https://perma.cc/XX9B-F9XF.

[71] Ryan Butler, *Q&A: DraftKings Predictions SVP Talks Launch, Future Plans*, Covers (Dec. 19, 2025), https://perma.cc/JSA2-AYMA.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 52 of 72

to be challenging for [prediction markets] to compete. But I think where you don't have anything else, it's pretty good."[72]

139. Robins repeated the point at the Global Gaming Expo in October 2025, telling the audience: "I look at it as a geographic answer to your question. What prediction markets allow companies to access are customers in the roughly half of the U.S. that does not have a legal sports betting product right now."[73]

140. To build the infrastructure for his strategy to operate in States where DraftKings cannot operate legally, on October 21, 2025, DraftKings acquired Railbird Technologies Inc. and its subsidiary Railbird Exchange, LLC, a designated contract market, on which DraftKings lists the contracts that power the Super App's Sports tab.

141. Upon information and belief, Robins personally approved that acquisition, in light of the control he exercises over the company and the fact that he signed the annual report in which DraftKings disclosed it.

142. Robins then personally announced the launch of DraftKings Predictions, and put his personal stamp on the decision to introduce the product in Florida and other States. In a Letter to Investors issued in November 2025, Robins wrote: "We are excited about our pending launch of DraftKings Predictions and its potential to expand our total addressable market. In the coming months, we expect DraftKings Predictions to enter many states with sport event contracts, unlocking a new customer base and revenue stream. Nearly half the country's population remains without access to legal online sports betting, but there are several other companies offering federally regulated Predictions in all 50 states. As growth in Predictions continues, this may also

---

[72] Gouker, *supra* note 5.

[73] GlobalGamingExpo, *Keynote - Inside the C-Suite: Gaming's Future in Focus on Stage*, YouTube (Oct. 9, 2025), at 47:14-44, https://tinyurl.com/537vsx5d.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 53 of 72

motivate more states to legalize online sports betting and iGaming with reasonable regulation and taxation."[74]

143. Robins reiterated the point in an interview with Schwab Network, stating, "if you look at it now, we're in sports betting in approximately 50% of the US population. States that have approximately 50%, so that leaves about half the country including the largest states like California, Texas, Florida that we are not currently in for online sports betting. So we have not had a vehicle to acquire customers anything like what we will see with prediction markets."[75]

144. Robins thus told DraftKings' investors, in his own name, that DraftKings Predictions existed to reach the population of the country that "remains without access to legal online sports betting," and that its growth might "motivate more states to legalize online sports betting and iGaming with reasonable regulation and taxation." By that account, Florida was a State to be "motivate[d]" (meaning ***coerced***) into granting DraftKings a license. Robins pledged to prevail through force of will rather than through legal compliance: "We will pursue this opportunity, we will compete, and we will win. For the same reasons that we have been successful competing in the sports betting industry, we expect to succeed here."[76]

145. Robins' own framing blows the whistle on his criminality. By Robins' account, the prediction-market "opportunity" beckons only in States where DraftKings is legally prohibited from offering online sports betting, and not in States where DraftKings operates legally. In a December 2025 interview with CNBC, Robins reiterated that, in States where DraftKings operates

---

[74] Dustin Gouker, *News: DraftKings Says It Is Launching Sports Prediction Markets This Year*, The Closing Line (Nov. 6, 2025), https://perma.cc/738Y-GWEL.

[75] Jason Robins, CEO, *Chairman and Co-Founder of DraftKings Inc., discusses key takeaways from the company's fourth-quarter results,* Schwab Network (Feb. 13, 2026), at 3:10, https://www.facebook.com/watch/?v=859227537118706.

[76] Gouker, *supra* note 74.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 54 of 72

lawfully, "we don't really need to add additional products," and that "the revenue opportunity probably won't be very significant in states that have legal sports betting."[77] But Florida does have legal online sports betting: the Compact reserves it exclusively to the Tribe. Robins nonetheless directed the deployment of the DraftKings Predictions-powered sportsbook in Florida, and confirmed that, through the Super App, DraftKings "will now have a sports product everywhere for customers across the entire country."[78] Robins made a deliberate decision to treat the Tribe's exclusive Compact rights as though they did not exist and to attack Florida's established framework as though it did not already regulate online sports betting.

146. The *Protect the Constitution* amended complaint also establishes that Robins knows DraftKings' offerings are illegal in Florida. In that litigation, over which Robins has personally exercised substantial control, the pleading alleges that DraftKings is a competitor of the Tribe to the extent that it offers "daily fantasy sports contests and free-to-play offerings" in the "commercial arena for online sports entertainment."[79] It does not mention DraftKings Predictions or the Super App sportsbook, even though those products compete for the identical sports-wagering dollars as the Tribe's lawful offerings. That strongly suggests that DraftKings and Robins *know* that DraftKings Predictions and the Super App sportsbook offerings are illegal products and are trying to shield them from judicial scrutiny.

147. With striking hypocrisy, the amended complaint in *Protect the Constitution* also alleges that *the Tribe* should not be permitted to offer online sports betting under the Compact and

[77] *DraftKings CEO on Entry to Prediction Markets: We'll Be Able to Compete Just Fine*, CNBC Television (Dec. 19, 2025), at 1:04-14, https://tinyurl.com/54txbewj.

[78] Oliver Dale, *DraftKings Launches Super App to Combine Sports Betting & Prediction Markets Nationwide*, AlienWP (Mar. 7, 2026), https://perma.cc/VRR6-2DPL.

[79] PTC Am. Compl. ¶¶ 9, 12.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 55 of 72

the Implementing Law because "the people of Florida have never been allowed to exercise their constitutional rights to decide whether sports betting should be authorized on a statewide basis."[80] DraftKings' arguments about the Tribe's rights are meritless. But they illustrate that Robins knows that Florida law prohibits online sports betting that occurs outside of the legal framework established by the Compact and Implementing Law.

148. Even as Robins focused on Florida, Floridians were not tempted to use DraftKings Predictions. As Robins explained, it was "confusing for customers" because people did not "think" about the DraftKings Predictions application. "If you search the app store, the first app, Sportsbook & Casino app, is what comes up."[81]

149. Accordingly, Robins devised a different plan: launch a "Super App" called DraftKings Sports & Casino that merges its licensed and regulated Sportsbook platform (unavailable as a standalone product in Florida) with its DraftKings Predictions offering so as to mislead Florida consumers into placing illegal sports wagers with DraftKings.[82] The purpose of the Super App, DraftKings explained to the Wall Street Journal, is to "make the look and feel of the platform a mirror of its sports-betting operations."[83]

150. Robins has repeatedly acknowledged that DraftKings Predictions is indistinguishable from sports betting. In an August 7, 2026 CNBC interview, Robins explained that "it's completely a myth" that prediction markets are "different from a sportsbook." "There's, as you know, market makers, Wall Street traders and institutional people that are making these

---

[80] *Id.* ¶ 3.

[81] *DraftKings CEO on launch of new 'super app,' prediction markets and more*, *supra* note 9, at 00:45.

[82] *DraftKings Outlines Expanded Growth Strategy and Unveils Plans to Launch Super App, "DraftKings Sports & Casino"*, *supra* note 33.

[83] Hamilton, *supra* note 34.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 56 of 72

bets that the customers are playing against. It's really no different in that regard from a sportsbook, in that you're up against somebody that is building models and doing things like that." Robins then called prediction markets for sports "an entertainment thing." Robins also bragged that DraftKings Predictions has caused "absolutely explosive growth" for Defendants because "we just opened up the rest of the country … this is like half the country launching at once."[84]

151. Robins has also intentionally launched the Super App in States where DraftKings cannot operate legally. For example, in DraftKings' Q2 2026 earnings call, Robins announced that "[w]e are executing on the Super App strategy that we laid out at our Investor Day in March, and we are seeing massive new customer acquisition in states without regulated Sportsbook"—a euphemism for *States where it is illegal for DraftKings to operate*. Robins confirmed that DraftKings is "focused … on the states we don't have an [online sports betting] offering."[85] In an interview with Yahoo Finance, Robins was even more explicit, stating: "I'm expecting big things this fall. I think we're going to add millions of new predictions customers"—all "*because we're offering our sports predictions product only in the states that we don't have legal sports betting*."[86] He repeated this point just last month and called out "Florida," one of "the biggest states population-wise that don't have legal" online sports betting, as one of the States "where we are seeing our Predictions growth."[87]

152. Robins' decision for DraftKings to launch the Super App sportsbook in Florida was specifically targeted at undermining the Tribe's bargained-for rights. When it launched the Super

---

[84] *DraftKings CEO on prediction markets: Some companies are spinning narratives that just aren't true*, CNBC (Aug. 7, 2026), at 3:00-5:00, https://tinyurl.com/3xxwnn34.

[85] *DraftKings (DKNG) Q2 2026 Earnings Call Transcript*, *supra* note 51.

[86] Hyman, *supra* note 4, at 1:00-33.

[87] DraftKings Inc. (DKNG) Presents at Wells Fargo 9th Annual Consumer Conference Transcript, Seeking Alpha (Sept. 22, 2026), https://tinyurl.com/ynbxf3ez.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 57 of 72

App sportsbook, DraftKings made clear that it was seeking to operate in "the states that don't have online sports betting."[88] Of course, Florida *has* legal and regulated online sports betting through the Compact and the Tribe. When DraftKings operates in Florida, it is pretending Florida's laws and the Compact have been wiped off the books.

153. Robins well understands that the Super App is a sportsbook. On DraftKings' Q1 2026 earnings call, asked to compare DraftKings Predictions to DraftKings' traditional Sportsbook, Robins derided other prediction markets as "irresponsibl[e]" for claiming that consumers "play[] against each other on prediction markets, when the reality is that most of the money is being put up, most liquidity is being put up by professional market makers, institutions, things like that."[89] Robins' comments amount to a confession of how he and DraftKings operate their own purported market. DraftKings is the professional market maker on its Super App. That makes it the house, and an illegal sportsbook.

154. Robins personally directed, approved, and participated in each element of the wrongful conduct alleged in this Complaint related to Pick6, including:

a. the decision to launch Pick6 in Florida and operate illegal gambling in violation of Florida law and the Compact;

b. the approval or direction of advertising campaigns blanketing Florida with promotions for illegal gambling products;

c. the deliberate decision to offer a sports gambling product without the protections or state oversight required by the Compact; and

d. the ongoing operation of illegal gambling platforms in Florida in violation of state law and the Tribe's exclusive gaming rights under the Compact.

---

[88] Jon Chesto, *To DraftKings, The Prediction Markets Are Both A Threat And An Opportunity*, Boston Globe (Apr. 1, 2026), https://tinyurl.com/42n63ku3.

[89] *DraftKings Inc. (DKNG) Q1 FY2026 earnings call transcript*, *supra* note 2, at 35:13.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 58 of 72

155. Beyond Pick6, Robins also conducts the Predictions Enterprise's affairs through illegal sports betting offered via DraftKings Predictions and the Super App sportsbook. DraftKings Predictions is a wholly owned subsidiary of DraftKings, and Robins personally directs and controls the affairs of DraftKings Predictions and the Super App through his control of DraftKings.

156. The violations alleged above are repetitive and continuous, and occur each time an illegal bet is solicited or accepted; they constitute predicate acts of racketeering under the Florida RICO Act.[90] They are not isolated incidents. They are each Enterprise's regular way of conducting business in Florida, they have occurred thousands of times, and they threaten to continue indefinitely. DraftKings has told investors that DraftKings Predictions is a core growth line that it now reports together with its licensed Sportsbook revenue as a single number, and that it expects 95% of the United States population to have access to its offerings by the end of 2026.[91] Absent injunctive relief, Robins and both Enterprises will continue to solicit and accept illegal wagers from Floridians.

**F. Harm To Florida's Policy, Florida Consumers, And The Compact**

157. The injuries inflicted by DraftKings' Illegal Sports Gambling Offerings transcend any commercial loss to the Tribe and the State of Florida. At its core, DraftKings has repeatedly attacked the regulatory system that Florida established to govern online sports betting within the State's borders and to fund its public programs.

[90] § 895.02(8)(a)48, Fla. Stat.

[91] *DraftKings Q1 2026 Earnings Presentation*, *supra* note 44, at 6.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 59 of 72

158. Every illegal wager DraftKings accepts diverts wagering activity away from the regulated, consumer-protective system Florida chose to implement and into an unregulated, illegal product offered by DraftKings.

159. Whatever nomenclature it uses—"Pick6," "Predictions," or a "Super App"—DraftKings' Illegal Sports Gambling Offerings flout Florida law. Florida has decided that legal sports betting should be conducted through a single, accountable, trustworthy, and heavily regulated operator, and it selected the Tribe, not DraftKings, as the steward of its policy.

160. DraftKings' conduct harms Florida consumers. Each Floridian who wagers with DraftKings is stripped of the safeguards Florida made a precondition of legal sports betting—age verification, state-supervised problem-gambling resources, and a licensed operator answerable to the State.

161. The State of Florida is itself harmed. Florida's revenue-share arrangement with the Tribe is the financial mechanism through which the Compact funds public-purpose programs and general state operations. Every illegal bet accepted by DraftKings diverts state revenue—revenue that should remain within and working for Floridians—and directs it instead to an out-of-state operator that trumpets tax avoidance as its business strategy.

162. The Compact is also under threat. The Compact is a bargained-for instrument between two sovereigns, designed, in conjunction with the Implementing Law, to be the exclusive vehicle through which sports betting is offered in Florida. DraftKings' Illegal Sports Gambling Offerings—the products, the marketing, the Super App, and the rest—are incompatible with that exclusivity and calibrated to undermine the Compact's integrity and its long-term viability. DraftKings' Illegal Sports Gambling Offerings also siphon significant revenue from the Tribe that would otherwise be used to meet the Tribe's governmental needs, as contemplated by the Compact.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 60 of 72

The Compact—a sovereign government-to-government instrument negotiated pursuant to federal law and approved by the Department of the Interior—is meaningless if DraftKings can simply ignore it and operate illegal sports betting however it pleases.

163. DraftKings' conduct is an affront to the rule of law, is worsening by the day, and threatens the entire framework Florida has established to protect consumers. The Tribe therefore respectfully seeks to enjoin DraftKings' criminal gambling operation and to disgorge the ill-gotten gains obtained by DraftKings. The Tribe will prioritize using funds recovered in this lawsuit from DraftKings for Florida-specific consumer protection initiatives and problem-gambling recovery programs.

## CAUSES OF ACTION

### COUNT ONE
### Action To Enjoin Illegal Gambling (§ 546.10(8)(a), Fla. Stat., and chapter 849, Fla. Stat.)
### (Against All Defendants)

164. Plaintiff repeats and realleges the allegations set forth above in paragraphs 1-163.

165. Florida law prohibits unauthorized gambling, including the receipt of money "staked, bet, or wagered" upon "the result of any trial or contest of skill, speed or power or endurance of human or beast." § 849.14, Fla. Stat. Florida law separately prohibits bookmaking and makes that conduct a felony of the third degree. *Id.* § 849.25(2). Florida law also prohibits the maintenance of any type of place for gambling or the use of "gaming implements or apparatus." *Id.* § 849.01. The Compact is the primary exception to Florida's general prohibition on gambling, and reserves to the Tribe the exclusive right to offer online sports betting in the State.

166. Section 546.10(8)(a) of the Florida Statutes expressly authorizes the Tribe to bring this action. It provides that, "[n]otwithstanding any other provision of law, an action to enjoin the operation of any game or machine pursuant to or for an alleged violation of this section or

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 61 of 72

chapter 849 may be brought only by … a federally recognized tribal government possessing sovereign powers and rights of self-governance which is a party to a compact with the state."

167. By statute, and through ratification of the Compact, Florida has authorized the Tribe to enforce the State's prohibition on unauthorized gambling.

168. Defendants violate chapter 849 through their continued operation of Pick6 and the Super App sportsbook. Each product accepts wagers from Florida consumers on the results of athletic contests, without authorization under the Compact, without a Florida license, and without the consumer protections Florida required as a condition of legal sports wagering. Each unlawful wager accepted is a discrete violation of chapter 849.

169. Defendants' Illegal Sports Gambling Offerings cause irreparable harm that cannot be adequately remedied through monetary relief alone. Each additional day of operation entrenches DraftKings' market position, exposes more Florida consumers to felony liability under chapter 849, and further hollows out the regulatory framework Florida deliberately enacted.

170. Under § 546.10(8)(a) and chapter 849, Florida Statutes, the Tribe is entitled to any and all injunctive relief, including an injunction enjoining each Defendant from operating, conducting, advertising, soliciting, accepting, processing, or otherwise facilitating any sports wagering activity in Florida outside the Compact, including Pick6 and the Super App sportsbook, and to disgorgement of the profits that Defendants have obtained through their unlawful conduct.

**COUNT TWO**
**Florida RICO (§§ 895.01 *et seq.*, Fla. Stat.)**
**(Against Defendant Jason Robins)**

171. Plaintiff repeats and realleges the allegations set forth above in paragraphs 1-163.

172. The Florida RICO Act makes it "unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity[.]" § 895.03(3), Fla. Stat. "Racketeering activity"

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 62 of 72

expressly includes conduct "to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit" any crime chargeable under "Chapter 849, relating to gambling, lottery, gambling or gaming devices, slot machines, or any of the provisions within that chapter." *Id.* § 895.02(8)(a)48. Any "aggrieved person" may bring a civil action for equitable relief, divestiture, dissolution, and other appropriate orders to prevent and restrain Florida RICO violations. *Id.* § 895.05. The Tribe is an aggrieved person within the meaning of the statute.

173. As alleged above, Robins conducts the affairs of two enterprises within the meaning of the Florida RICO Act. The DraftKings Enterprise is DraftKings, Inc., a corporation and therefore an "enterprise" under § 895.02(5), Florida Statutes. The Predictions Enterprise is GUS III LLC d/b/a DraftKings Predictions, a limited liability company and therefore likewise an "enterprise" under § 895.02(5), Florida Statutes. Each is an enterprise in its own right, without regard to its association with the other. In the alternative, DraftKings, Inc. and its wholly owned subsidiary GUS III LLC d/b/a DraftKings Predictions together constitute one enterprise with the common purpose of profiting from sports wagering in Florida, are connected through ongoing relationships, and possess longevity sufficient to pursue that purpose. The DraftKings Enterprise has an existence entirely separate from the pattern of racketeering activity alleged here: it conducts a large, lawful, licensed sportsbook business in approximately 27 States and Washington, D.C. The Predictions Enterprise likewise has an existence separate from that pattern: it is a separately organized limited liability company that holds NFA identification number 0571907, and does business under its own names, "DraftKings Predictions" and "DraftKings Sports."[92] Robins is a "person" within the meaning of the Florida RICO Act who is distinct from each Enterprise. He owns neither Enterprise; he holds over 88% of DraftKings' total voting power and directs each

[92] *BASIC Profile for GUS III LLC*, *supra* note 64.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 63 of 72

Enterprise's affairs, while each Enterprise's assets, revenues, employees, contracts, and legal obligations remain its own. Robins is accordingly a person distinct from each of the enterprises whose affairs he conducts.

174. As alleged above, each illegal wager solicited, accepted, processed, paid, or otherwise facilitated through Pick6 and the Super App sportsbook is a discrete predicate act of racketeering within the meaning of § 895.02(8)(a)48. Robins, and DraftKings and DraftKings Predictions acting at his direction, have committed thousands of such acts, continuously, since December 2025 in the case of the DraftKings Predictions-powered sportsbook and since January 2026 in the case of Pick6. The acts are related in purpose, participants, methods, and victims, and they are not isolated incidents. They are each Enterprise's regular way of doing business in Florida, and they pose a continuing threat of further racketeering activity: DraftKings has publicly committed to expanding this line of business and now reports its DraftKings Predictions revenue together with its licensed sportsbook revenue as a single number.

175. Robins has violated § 849.14, Florida Statutes, which forbids not only the person who "stakes, bets, or wagers any money or other thing of value upon the result of any trial or contest of skill, speed or power or endurance of human or beast, or whoever receives in any manner whatsoever any money or other thing of value staked, bet, or wagered, or offered for the purpose of being staked, bet, or wagered," but also "whoever aids, or assists, or abets, or influences in any manner in any of such acts." § 849.14, Fla. Stat. By directing, controlling, launching, and facilitating the operation of Pick6 and the Super App sportsbook—through which Florida consumers stake and wager money on the results of athletic contests, and through which the Enterprises receive money—Robins aids, assists, abets, and influences those acts and thereby

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 64 of 72

himself violates § 849.14. Each wager placed on Pick6 and the Super App sportsbook is a predicate act of racketeering within the meaning of § 895.02(8)(a)48.

176. Robins has also violated § 849.01, Florida Statutes, which provides that "[w]hoever by herself or himself, her or his servant, clerk or agent, or in any other manner has, keeps, exercises or maintains a gaming table or room, or gaming implements or apparatus, or house, booth, tent, shelter or other place for the purpose of gaming or gambling or in any place of which she or he may directly or indirectly have charge, control or management, either exclusively or with others, procures, suffers or permits any person to play for money or other valuable thing at any game whatever, whether heretofore prohibited or not, commits a misdemeanor of the second degree." § 849.01, Fla. Stat. Robins directly or indirectly has charge, control, and management of each Enterprise, "exclusively or with others," and Pick6 and the DraftKings Predictions-powered Super App sportsbook are each "gaming implements or apparatus" and a "place for the purpose of gaming or gambling" that Robins has, keeps, exercises, and maintains through DraftKings and DraftKings Predictions as his agents. Robins' direction of the launch and continued operation of Pick6 and of the Super App sportsbook each constitutes a discrete predicate act.

177. Robins has also violated § 849.25, Florida Statutes, which makes it a felony of the third degree to "engage[] in bookmaking"—defined as "the act of taking or receiving, while engaged in the business or profession of gambling, any bet or wager upon the result of any trial or contest of skill, speed, power, or endurance[.]" § 849.25(1)(a), (2), Fla. Stat. Among the factors the statute directs courts to consider in determining that a person has engaged in bookmaking is "[e]ngaging in a common scheme with two or more persons to take or receive wagers." *Id.* § 849.25(1)(b)5. Robins engages in precisely such a common scheme: acting in concert with DraftKings and DraftKings Predictions, as well as their employees. Through this scheme, Robins

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 65 of 72

takes and receives wagers from Florida consumers on the results of athletic contests, sets the odds and charges the margin from which the Enterprises profit, and does so as a continuous commercial operation, satisfying additional statutory factors including "[t]aking advantage of betting odds … to produce a profit" and taking wagers far exceeding the statutory volume thresholds. *Id.* § 849.25(1)(b).

178. Robins' conduct independently constitutes conspiracy to commit bookmaking, which § 849.25(4) subjects to the same felony penalties.

179. Each such act is a predicate act of racketeering within the meaning of § 895.02(8)(a)48.

180. Further, as alleged above, Robins has conducted or participated, directly or indirectly, in the conduct of each Enterprise's affairs through the pattern of racketeering activity, and has participated in the operation and management of each Enterprise. Robins has personally directed and approved the launch of Pick6 and the Super App sportsbook in Florida; the decision to integrate Pick6 within the Super App; and the political and litigation campaigns intended to dismantle the Compact and solicit illegal sports wagers. As alleged above, Robins personally announced the launch of DraftKings Predictions in a Letter to Investors issued in his own name, and personally determined the States in which the Predictions Enterprise would deploy the DraftKings Predictions-powered sportsbook. He deployed it in Florida notwithstanding his own public statements that the opportunity lay only in States "that don't have legal online sports betting,"[93] and that DraftKings would not deploy it where it already held a sports betting license because doing so would "upset regulators that we have great relationships with."[94]

---

[93] Chesto, *supra* note 88.

[94] Edelstein, *supra* note 6.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 66 of 72

181. Robins' control is structural, not merely practical: DraftKings operates as a "controlled company" under Nasdaq listing standards precisely because Robins holds a majority of its voting power. Robins therefore controls the decisions of the DraftKings Enterprise, and through it the decisions of the Predictions Enterprise, as well as the composition of the board to which he nominally reports.

182. Pursuant to § 895.05, Florida Statutes, the Tribe is entitled to any and all injunctive relief, including an injunction enjoining Robins, and all others acting in concert with him, from continuing to conduct the affairs of either Enterprise in Florida through a pattern of racketeering activity, to disgorgement of the profits obtained through that pattern of racketeering activity, and to reasonable attorneys' fees and costs.

**COUNT THREE**
**Violation Of Florida Deceptive And Unfair Trade Practices Act ("FDUTPA") (§§ 501.201 *et seq*., Fla. Stat.)**
**(Against All Defendants)**

183. Plaintiff repeats and realleges the allegations set forth above in paragraphs 1-163.

184. Under the FDUTPA, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are … unlawful." § 501.204(1), Fla. Stat.

185. "[A]nyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part." *Id.* § 501.211(1). The Tribe is an aggrieved party within the meaning of the statute.

186. Defendants have engaged, and continue to engage, in deceptive and unfair acts and practices in trade or commerce in Florida. Defendants market Pick6 and sports wagers on the Super App sportsbook to Florida consumers as lawful, when those products in fact violate Florida

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 67 of 72

law and the Compact and expose Florida consumers to criminal liability. Defendants describe these products as "peer-to-peer" fantasy sports and as a "prediction market" to disguise what is in substance unlicensed and unlawful sports betting. Defendants' conduct is also unfair because it offends and undermines the established public policy of Florida as embodied in chapter 849, the Compact, and the comprehensive consumer-protection regulations the Compact implements through the Tribe, by stripping Florida consumers of the safeguards the State determined were essential to legal sports betting. Defendants' Terms of Use admit their offerings may not be legal in Florida, and push all risk of that illegality onto the consumer.

187. Defendants' deceptive and unfair practices have caused, and continue to cause, non-speculative injury to the citizens of Florida and the Tribe, which goes beyond a general interest in curbing deceptive or unfair conduct. As the only entity authorized under Florida law and the Compact to offer online sports wagering in Florida, the Tribe is directly injured by, and has a direct interest in curbing, Defendants' deceptive marketing of competing illegal products in Florida.

188. Pursuant to § 501.211(1), Florida Statutes, the Tribe is entitled to a declaratory judgment that Defendants' conduct violates FDUTPA and to any and all injunctive relief, including an injunction prohibiting Defendants from continuing the deceptive and unfair acts and practices alleged herein. Pursuant to § 501.2105, Florida Statutes, the Tribe seeks reasonable attorneys' fees and costs. The Tribe further seeks nominal damages on this Count. Consistent with the public-interest character of the relief sought in this action, the Tribe does not seek its own actual damages on this Count.

**COUNT FOUR**
**Florida Common-Law Unfair Competition**
**(Against All Defendants)**

189. Plaintiff repeats and realleges the allegations set forth above in paragraphs 1-163.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 68 of 72

190. "The Florida common law of unfair competition is an 'umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'" *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1325 (M.D. Fla. 2007) (quoting *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)). Unfair competition under Florida law can include business interference and misrepresentation. *Id.* To state a claim, the plaintiff must plead (1) deceptive or fraudulent conduct of a competitor and (2) likelihood of consumer confusion.

191. Defendants engage in deceptive or fraudulent conduct. Defendants represent to Florida consumers, expressly and by implication, that Pick6 and sports betting on the Super App sportsbook are legal forms of sports wagering in Florida, when in truth those products violate Florida law and the Compact. Defendants describe these products using terminology designed to obscure their true nature—"peer-to-peer" fantasy sports, "prediction market," "event contracts"—notwithstanding that the products are functionally and visually identical to traditional sportsbook offerings, including those that DraftKings itself operates in licensed States and those the Tribe operates lawfully in Florida through Hard Rock Bet.

192. Defendants' conduct creates a substantial likelihood of consumer confusion, and Defendants know it. Florida consumers reasonably—but incorrectly—conclude that, because a major brand like DraftKings publicly offers these products in Florida, the products must be lawful. That conclusion is reinforced by the side-by-side similarity of Defendants' offerings to the Tribe's licensed sportsbook and to DraftKings' licensed offerings available in other regulated States, including identical wagering formats, market types, and user interfaces, and—until August 28, 2026—similar or identical odds. As a result, consumers divert their wagering activity to Defendants' unlawful platforms.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 69 of 72

193. The Tribe and Defendants compete for a common pool of customers—Florida consumers who wish to wager on sports. Through its operation of Hard Rock Bet, the Tribe is the only entity legally authorized to offer online sports wagering to Florida consumers. Defendants' unlawful Florida operations target the same customer pool.

194. The Tribe is entitled to any and all injunctive relief, including an injunction restraining Defendants from continuing the conduct alleged herein, and to restitution and/or disgorgement of all profits Defendants have obtained in Florida through their unfair-competition conduct, together with such other equitable relief as the Court deems just and proper.

**COUNT FIVE**
**Declaratory Relief (§§ 86.011, 86.021, Fla. Stat.)**
**(Against All Defendants)**

195. Plaintiff repeats and realleges the allegations set forth above in paragraphs 1-163.

196. This Count is brought pursuant to Florida's Declaratory Judgment Act, §§ 86.011 and 86.021, Fla. Stat., which authorizes any person whose rights, status, or other equitable or legal relations are affected by a statute, contract, or other obligation to obtain a declaration of rights, status, or other legal relations thereunder.

197. The Tribe seeks a declaration from this Court that (i) Pick6 and sports betting on the Super App sportsbook each constitute illegal gambling under chapter 849; and (ii) Defendants are without legal authority to offer, market, facilitate, or process such products in Florida.

198. This declaratory relief is necessary to prevent Defendants from operating, conducting, maintaining, advertising, marketing, soliciting, accepting, processing, settling, clearing, paying, or otherwise facilitating any sports wagering activity in Florida.

199. There is a bona fide, actual, present and practical need for the requested declaration. Specifically, the parties require a determination of the legality of Defendants' Florida gambling operations under Florida law.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 70 of 72

200. The requested declaration deals with a present, ascertainable state of facts or present controversy as to a state of facts.

201. The Tribe's legal rights and status are directly and adversely affected by Defendants' conduct. The Tribe holds the exclusive right to offer online sports wagering throughout Florida under the Compact, as ratified by the Florida Legislature via the Implementing Law. Defendants publicly and repeatedly assert that Pick6 and sports betting on the Super App sportsbook are lawful in Florida. The Tribe disputes this assertion. The parties thus hold squarely adverse legal positions with immediate and material consequences to the Tribe's business, its Compact-granted exclusivity, and the public-interest framework Florida established.

202. The antagonistic and adverse interests are all before the Court by the proper process and representation.

203. All Defendants are necessary parties to this declaratory action under § 86.091, Fla. Stat., as each Defendant has or claims an interest in Defendants' ability to operate the products at issue in Florida.

204. The declaratory relief sought is not merely the giving of legal advice by this Court.

205. Pursuant to § 86.111, Florida Statutes, the Tribe requests that the Court hold a speedy hearing on Count Five and advance this cause on the calendar.

206. The Tribe is entitled to judgment in its favor on Count Five, and any other available relief the Court deems just and proper, including any and all injunctive relief, including an injunction consistent with the declarations sought herein.

## **PRAYER FOR RELIEF**

WHEREFORE, the Seminole Tribe of Florida respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally, and grant the following relief:

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 71 of 72

a. A declaratory judgment that Pick6 and sports betting on the Super App sportsbook constitute illegal gambling under Florida law;

b. Any and all injunctive relief, including an injunction enjoining Defendants, and each of their officers, directors, employees, agents, affiliates, and all persons acting in concert with them, from operating, conducting, maintaining, advertising, marketing, soliciting, accepting, processing, settling, clearing, paying, or otherwise facilitating any sports wagering activity in Florida, including through Pick6 and sports betting on the Super App sportsbook;

c. Restitution and disgorgement of all profits, revenues, and other ill-gotten gains Defendants have derived from their illegal Florida operations, to be applied to the public-interest purposes the Compact was designed to serve, including consumer-protection programs and problem-gambling treatment, prevention, and recovery;

d. Nominal damages;

e. Reasonable attorneys' fees and costs, as authorized by law;

f. Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

g. Such further and additional relief, at law or in equity, as the Court deems just and proper.[95]

[95] Plaintiff intends to seek leave to amend this Complaint to seek punitive damages under § 768.72, Fla. Stat.

Unique Code : CAA-FAA-BCABB-BABFHDCAA-BHCCGED-I Page 72 of 72

Dated: October 8, 2026

Respectfully submitted:

/s/ Jason D. Sternberg

HOBBS, STRAUS, DEAN
& WALKER, LLP

Joseph H. Webster
(*pro hac vice forthcoming*)
Jens W. Camp
(*pro hac vice forthcoming*)
1899 L Street NW, Suite 1200
Washington, D.C. 20036
(202) 822-8282
jwebster@hobbsstraus.com

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

Derek L. Shaffer (lead counsel)
(*pro hac vice forthcoming*)
Keith H. Forst
(*pro hac vice forthcoming*)
555 13th Street NW, Suite 600
Washington, D.C. 20004
(202) 538-8000
derekshaffer@quinnemanuel.com
keithforst@quinnemanuel.com

Jason D. Sternberg (Fla. Bar No. 72887)
Erica L. Perdomo (Fla. Bar No. 105466)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
(305) 402-4880
jasonsternberg@quinnemanuel.com
ericaperdomo@quinnemanuel.com

Alex H. Loomis
(*pro hac vice forthcoming*)
111 Huntington Avenue, Suite 520
Boston, MA 02199
(617) 712-7100
alexloomis@quinnemanuel.com

B. Dylan Proctor
(*pro hac vice forthcoming*)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
dylanproctor@quinnemanuel.com

*Attorneys for Plaintiff, the Seminole Tribe of Florida*